**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

RECEIVED
USDC CLERK, FLORENCE, SC
**2021 MAR 19 PM 4:30**

|  |  |
|---|---|
| } | **FILE NO.** |
| } |  |
| **BRAD R. JOHNSON,** } | **COMPLAINT UNDER (A) THE** |
| **Plaintiff,** } | **RACKETEER INFLUENCED AND** |
| } | **CORRUPT ORGANIZATIONS ACT** |
| **v.** } | **OF 1970, (B) THE FAIR DEBT** |
| } | **COLLECTION PRACTICES ACT** |
| **PENNYMAC LOAN SERVICES, LLC,** } | **OF 1970, (C) THE REAL ESTATE** |
| **Defendant,** } | **SETTLEMENT PROCEDURES ACT,** |
| } | **AND (D) BREACH OF CONTRACT** |
| **STANDARD GUARANTY** } | **ACCOMPANIED BY FRAUD** |
| **INSURANCE COMPANY,** } |  |
| **Defendant,** } |  |
| } |  |
| **ASSURANT, INC.** } | **VERIFICATION** |
| **Defendant.** } |  |
| } | **DEMAND FOR JURY TRIAL** |
| } |  |

**COMPLAINT UNDER (A) THE RACKETEER INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT OF 1970 (18 U.S.C. §§ 1961-1968 (1994)), (B) THE FAIR DEBT**
**COLLECTION PRACTICES ACT OF 1978 (15 U.S.C. §§ 1692-1692o),**
**(C) THE REAL ESTATE SETTLEMENT PROCEDURES ACT (12 U.S.C. §§ 2601–2617)**
**AND (D) BREACH OF CONTRACT ACCOMPANIED BY FRAUD**

Plaintiff, Brad R. Johnson (hereinafter "Johnson") [a member of a class of assignee

PennyMac debtors that were each subject to an unlawful, forced lender-placed policy, formed

from an agreement between PennyMac, SG Insurance and Assurant], complains against (1)

Defendant PennyMac Loan Services, LLC (hereinafter "PennyMac"), (2) Defendant, Standard

Guarantee Insurance Company (hereinafter "SG Insurance"), and Defendant, Assurant, Inc.

(hereinafter "Assurant") under The Racketeer Influenced and Corrupt Organizations Act (18

U.S.C. §§ 1961-1968). In addition, Johnson complains against PennyMac under (a) The Fair

Debt Collection Practices Act of 1978 (15 U.S.C. §§ 1692-1692o), (b) The Real Estate

Settlement Procedures Act (12 U.S.C. §§ 2601–2617) and (c) Breach of Contract Accompanied

by Fraud (including Breach of Contract (Deed of Trust) and Quasi Contract (unjust enrichment)).

Dr. Johnson alleges on knowledge, with respect to himself and his own conduct, and upon the

basis of information and belief, as to all other matters, as follows.

## NATURE OF THE CLAIMS

1. Count I of this Complaint *arises* out of **schemes and artifices** executed by employee/agents

   of Defendants, PennyMac, SG Insurance, and Assurant (including Mr. Saldivar and Ms.

   Sanchez), through mail and wire communications and fraudulent and extortionate means,

   within an *organizational nexus*, to unlawfully deprive Johnson of money and a beneficial

   interest in real property, where over the last ten years, these **schemes and artifices** have been

   employed by said Defendants, within an organizational nexus, to deprive other persons

   similarly situated of money and their beneficial interests in real property. The first 2 claims

   under Count I are private (civil) causes of action arising under the provisions of the

   Racketeer Influenced and Corrupt Organizations Act of 1970 (RICO), 18 U.S.C. §§ 1961-

   1968 (1994), where in bringing Count I, Johnson seeks to recover statutory damages under

   18 U.S.C. § 1964(c) (1994), along with the costs of this suit, interest and reasonable

   attorneys' fees (if attorneys' fees are incurred by Johnson) for Defendants' violations of the

   provisions of RICO. In Count I(a), Johnson alleges that each of the Defendants, PennyMac,

   SG Insurance and Assurant, violated 18 U.S.C. § 1962(c) by conducting or participating in

   the conduct of the affairs of an enterprise through a pattern of racketeering activity, where at

   least two acts of racketeering activity per Defendant are specifically alleged. Specifically,

   each of the Defendants, PennyMac, SG Insurance and Assurant, conducted or participated in

   the conduct of the affairs of The PennyMac Association-in-Fact RICO Enterprise by

   engaging in the RICO predicate acts of mail and wire fraud (pursuant to 18 U.S.C. §§ 1341

and 1343, respectively) and Hobbs Act (18 U.S.C. § 1951) extortion, constituting a pattern of racketeering activity, to defraud and threaten Johnson for the purpose of obtaining (or seeking to obtain), from Johnson, money and control over Johnson's real property (Lots 16 & 18), thereby depriving Johnson of said money and other economic property rights, including exclusivity over his real property (Lots 16 & 18). In Count I(b), Johnson alleges that each of the Defendants, PennyMac, SG Insurance and Assurant, violated 18 U.S.C. §§ 1962(d) by conspiring with others to conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity, where at least two acts of racketeering activity per Defendant are specifically alleged. Specifically, each of the Defendants, PennyMac, SG Insurance and Assurant, conspired to participate in the conduct of the affairs of The PennyMac Association-in-Fact RICO Enterprise by engaging in the RICO predicate acts of mail and wire fraud (pursuant to 18 U.S.C. §§ 1341 and 1343, respectively) and Hobbs Act (18 U.S.C. § 1951) extortion, constituting a pattern of racketeering activity, to defraud and threaten Johnson for the purpose of obtaining (or seeking to obtain), from Johnson, money and control over Johnson's real property (Lots 16 & 18), thereby depriving Johnson of said money and other economic property rights, including exclusivity over his real property (Lots 16 & 18). Count II of this Complaint is a claim against PennyMac, arising under the provisions of The Fair Debt Collection Practices Act of 1978, Pub. L. No. 95-109, 803(6)(F), 91 Stat. 874, 875 (1977) (codified as amended at 15 U.S.C. §§ 1692-1692o (1994 & Supp. III 1998)), hereinafter referred to as the FDCPA, where in bringing this claim, Johnson seeks to recover statutory damages, not to exceed $1,000.00 per violation, plus reasonable attorney fees (if attorneys' fees are incurred by Johnson) under 15 U.S.C. 1692(k)(a) for PennyMac's violations of the provisions of the FDCPA. Count III of this Complaint is a claim against

PennyMac under the laws of the states of North Carolina and South Carolina for *Breach of Contract (Deed of Trust)* and *Breach of Contract Accompanied by Fraudulent Acts*, respectively, and, in the alternative, Quasi-Contract (unjust enrichment). Count IV of this Complaint is a claim against PennyMac, arising under the provisions of The Real Estate Settlement Procedures Act (12 U.S.C. §§ 2601–2617) [hereinafter referred to as "RESPA"), where in bringing this claim, Johnson seeks to recover statutory and punitive damages, plus reasonable attorney fees (if attorneys' fees are incurred by Johnson, for PennyMac's violations of the provisions of RESPA.

## PARTIES

2.  **PennyMac Loan Services, LLC.** PennyMac is a Delaware limited liability company, with its principal office located at 3043 Townsgate Road in Westlake Village, CA 91361. PennyMac's sole member is Private National Mortgage Acceptance Company, LLC (PNMAC). PNMAC has 2 members: PNMAC Holdings, Inc. (HOLDINGS) and PennyMac Financial Services, Inc. HOLDINGS is a Delaware corporation residing in Delaware and California and not in South Carolina. PFSI is a Delaware publicly held corporation residing in Delaware and California and not in South Carolina. On 11/1/2018, PennyMac Financial Services, Inc. (PFSI) changed its name to PNMAC Holdings, Inc. (HOLDINGS). PennyMac is in the business of loan services. As a collective entity, PennyMac, acts only through its agents and, hence, is liable for the statements or wrongful acts of its agents and employees, when they are acting within the scope of their authority or the course of their employment. Also, PennyMac is affected with constructive knowledge of all material facts of which an employee/agent acquires knowledge, while acting in the course of his/her employment and within the scope of his/her authority. This compartmentalized structure is common to all

large corporations, including PennyMac. In particular, PennyMac compartmentalizes knowledge, subdividing the elements of specific duties and operations into smaller components (e.g. Escrow department, Insurance Area). Because PennyMac has this compartmentalized structure that is common to all large corporations, the aggregate knowledge of these components constitutes PennyMac's knowledge of a particular operation. It is irrelevant whether employees administering one component of an operation know the specific activities of other employees administering other aspects of the operation.

3.  **Brad R. Johnson, Ph.D., J.D., CPA (Inactive, OR, #4278).** Dr. Johnson is an individual citizen and resident of Myrtle Beach, Horry County, South Carolina, with his legal residence and domicile located at 8669 Laurel Woods Drive in Myrtle Beach, SC 29588, and has been married to Elci Wijayaningsih since January 2000. Professionally, Dr. Johnson is employed by the State of South Carolina as a tenured Professor of Accounting (and Accounting Program Coordinator) at Francis Marion University (FMU) with his principal place of business at 260 Founders Hall in the School of Business, Francis Marion University, Box 100547, Florence, SC 29502, telephone number (843) 661-1427. Specifically, Dr. Johnson (a) has been teaching Federal Taxation at the University Graduate and Undergraduate levels for approximately 40 years and (b) has been a licensed (active or inactive) Oregon C.P.A. for over 38 years.

4.  **Standard Guaranty Insurance Company**. SG Insurance was formed in Georgia, with the address of its principal executive office located at 260 Interstate North Circle SE in Atlanta, GA 30339, telephone number (770) 763-1000. Accordingly, SG Insurance is a resident of Georgia and not of South Carolina. The great grandparent of SG Insurance is Assurant. SG Insurance is in the business of providing forced, lender-placed insurance exclusively to

PennyMac. In South Carolina, SG Insurance is subject to service of process by serving:
Director of the Department of Insurance, in his capacity as agent for service of process for
Standard Guaranty Insurance Company, South Carolina Department of Insurance, Post Office
Box 100105, Columbia, SC 29202.

5. **Assurant, Inc.** Assurant is a publicly held Delaware Corporation with the address of its
principal executive office located at 28 Liberty Street, 41st Floor, New York, NY 10005.
Accordingly, Assurant is a resident of New York and Delaware and not of South Carolina.
As a collective entity, Assurant, acts only through its agents, and hence is liable for the
statements or wrongful acts of its agents and employees, when they are acting within the
scope of their authority or the course of their employment. Also, Assurant is affected with
constructive knowledge of all material facts of which an employee/agent acquires
knowledge, while acting in the course of his/her employment and within the scope of his/her
authority. This compartmentalized structure is common to all large corporations, including
Assurant. In particular, Assurant compartmentalizes knowledge, subdividing the elements of
specific duties and operations into smaller components (e.g., Complaint Resolution
Department). Because Assurant has this compartmentalized structure that is common to all
large corporations, the aggregate knowledge of these components constitutes Assurant's
knowledge of a particular operation. It is irrelevant whether employees administering one
component of an operation know the specific activities of other employees administering
other aspects of the operation.

## FACTUAL BASIS FOR CLAIM

6. **Dr. Johnson's cash purchase of Lots 16 and 18.** As a consequence of Dr. Johnson's cash purchase of Lots 16 and 18, on November 7, 2008, AmTrust Bank f/k/a Ohio Savings Bank, as Grantor, conveyed the property more particularly described below to Brad Johnson, as Grantee, by executing and delivering a Limited Warranty Deed, recorded on November 10, 2008, in Book 2856, Page 708 of the Brunswick County Public Registry, North Carolina:

> **Being all of Lots 16 and 18, Block 186, Section N-6, Long Beach (now Oak Island), NC as shown on map recorded in Map Book 11, Page 89, Brunswick County Registry.**

*See* Exhibit I - Limited Warranty Deed for Lots 16 & 18, recorded on November 10, 2008, incorporated by reference herein, a true and correct copy.

7. On or before November 7, 2008, having total control over Lots 16 & 18, for the purpose of insuring the home on Lots 16 & 18, Dr. Johnson, individually, made the personal and unilateral decision to purchase dwelling and flood insurance from the Farm Bureau, which was maintained by Dr. Johnson until 2018.

8. **Dr. Johnson's cash purchase of Lots 13, 15 and 17.** As a result of Dr. Johnson's cash purchase of Lots 13, 15 and 17, on or about August 25, 2012, Homer E. Wright, Jr., as Grantor, conveyed the property more particularly described below to Brad Johnson, as Grantee, by executing and delivering a General Warranty Deed, recorded on August 31, 2012, in Book 3307, Page 799 of the Brunswick County Public Registry, North Carolina:

> **BEING ALL OF LOTS 13, 15 AND 17, BLOCK 186, SECTION N-6, LONG BEACH (now Oak Island) as per map for National Development Corp. prepared by Howard M. Loughlin, Registered Land Surveyor, recorded in Map Book 11, page 89, office of the Register of Deeds for Brunswick County, North Carolina.**

*See* Exhibit II - General Warranty Deed for Lots 13, 15 & 17, recorded on August 31, 2012, incorporated by reference herein, a true and correct copy.

9. Having total control over Lots 13, 15 & 17, for the purpose of avoiding the recurring, annual Sewer District Fee of about $800 per year, levied upon owners of undeveloped parcels by the Town of Oak Island, North Carolina, in two Instruments of Combination (for property tax and assessment purposes only), dated October 29, 2012 and June 12, 2013, Dr. Johnson, individually, made the personal and unilateral decision to combine Lots 13, 15 & 17 with contiguous Lots 16 & 18. *See* Exhibit III - Instruments of Combination (for Property Tax and Assessment Purposes Only), Dated October 29, 2012 and June 12, 2013, incorporated by reference herein, a true and correct copy.

10. On June 9, 2013, Dr. Johnson submitted a Uniform Residential Loan Application to Weststar Mortgage, Inc. for the purpose of "refinancing" (i.e., debt consolidation). In addition, Dr. Johnson, individually, made the personal and unilateral decision to elect (a) to continue purchasing, from the Farm Bureau, dwelling insurance and flood insurance on his home located on Lots 16 & 18 and (b) to have Weststar Mortgage, Inc. set up an escrow account so that Dr. Johnson would pay property taxes and insurance for the entire combined parcel on a monthly basis for the purpose of having a more even cash outflow.

11. In the course of the evaluation of Dr. Johnson's loan application by the underwriters, **Weststar ordered an appraisal**, whereupon "[t]he purpose of the appraisal [was only] to provide an opinion of the market value of the property described in the body of [the] report" (i.e., Lots 13, 15, 16, 17 & 18). *See* Exhibit IV - Appraisal of Lots 13, 15, 16, 17 & 18 Dated June 12, 2013, incorporated by reference herein, a true and correct copy.

12. In the course of evaluating Dr. Johnson's loan application, Weststar underwriters demanded more information and documents as a requisite to the closing of the loan. *See* Exhibit V – E-Mail Communications Between Weststar and Dr. Johnson, dated June 28, 2013, incorporated by reference herein, a true and correct copy.

13. On or after July 1, 2013, in a telephone call between Weststar's Loan Originator, Pamela Franz, and Dr. Johnson, Dr. Johnson asked Weststar's Loan Originator, Pamela Franz, who he should contact if he had questions regarding the closing documents. Weststar's Loan Originator, Pamela Franz, stated that she would answer his questions and that he could question any document except for the legal description of the property in the Deed of Trust, which was referenced in the Note. Weststar's Loan Originator, Pamela Franz, stated emphatically that the legal description of the property described in the Deed of Trust could not be changed under any circumstances.

14. As a result of the careful, thorough and detailed evaluation and quality reviews of Dr. Johnson's loan application, conducted by Weststar's underwriters and Westar's senior loan officers between July 15-17, 2013, permission to close was granted by said persons. *See* Exhibit VI – Various E-Mail Communications Between Weststar's Loan Originator, Pamela Franz, and Dr. Johnson, incorporated by reference herein, a true and correct copy.

15. Weststar's Loan Originator, Pamela Franz, told Dr. Johnson that closing documents would be electronically transmitted to Dr. Johnson. Furthermore, Weststar's Loan Originator, Pamela Franz, gave Dr. Johnson instructions for signing said closing documents, where an exact timeline for signing said closing documents must be followed to successfully close the loan. *See* Exhibit VI – Various E-Mail Communications Between Weststar's Loan Originator, Pamela Franz, and Dr. Johnson.

16. When Dr. Johnson received the closing documents, a Deed of Trust was included in those

documents. *See* Exhibit VII – Deed of Trust Dated July 19, 2013 and Recorded July 24,

2013, incorporated by reference herein, a true and correct copy. On pages 2-3, it states:

> "TRANSFER OF RIGHTS IN THE PROPERTY
> The beneficiary in this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successor and assigns of MERS. **This Security Instrument secures to Lender:** (i) the repayment of the loan, and all renewals, extensions and modifications of the Note; and (ii) **the performance of Borrower's covenants and agreements under this Security Instrument and the Note.** For this purpose, **Borrower irrevocably grants and conveys to Trustee and Trustee's successors and assigns, with power of sale, the following described property located** . . .
> SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT 'A'.
> **Which currently has the address of 111 SouthEast 14th Street, Oak Island, North Carolina 28465**
> TO HAVE AND TO HOLD this property unto Trustee and Trustee's successors and assigns, forever, together with all of the improvements now or hereafter erected on the property and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." **Borrower understands and agrees that MERS holds only legal title to the interests granted by the Borrower in this Security Instrument,** but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any and all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and cancelling this Security Instrument." Bold added.

17. In particular, Exhibit "A" of the Deed of Trust identified in Paragraph 16 describes the

Property as:

> **"The land referred to herein below is situated in the County of Brunswick State of North Carolina described as follows:**
>
> **Being all of Lots 13, 15 and 17, Block 186, Section N-6, Long Beach (now Oak Island) as per map for National Development Corp prepared by Howard M. Loughlin Registered Land Surveyor, recorded in Map Book 11, Page 89, office of the Register of Deeds for Brunswick County, North Carolina.**
>
> **Parcel ID: 235-IM-036, 2351M037**
>
> **This being the same property conveyed to Brad Johnson from Homer E. Wright, Jr., unmarried in a Deed dated August 2, 2012, recorded August 31, 2012, in Book 3329 Page 0354.**
>
> **Property Commonly Known As: 111 SouthEast 14th Street Oak Island, NC 28465"**

18. When Dr. Johnson received the closing documents, a Note was included in those closing documents. *See* Exhibit VIII – Note Dated July 19, 2013 and Recorded July 24, 2013, incorporated by reference herein, a true and correct copy. On page 2, it states:

    > "UNIFORM SECURED NOTE
    >     This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as the Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note."

19. When Dr. Johnson received the closing documents, Dr. Johnson had a number of questions. These questions were E-mailed to Weststar's Loan Originator, Pamela Franz, who promptly responded to the questions of Dr. Johnson. *See* Exhibit VI – Various E-Mail Communications Between Weststar's Loan Originator, Pamela Franz, and Dr. Johnson.

20. When Dr. Johnson received the closing documents, Dr. Johnson recognized that the Deed of Trust, referenced above in Paragraphs 16 & 17, was a Security Instrument that had as its purpose to secure to Weststar (a) the repayment of the loan, and all renewals, extensions and

modifications of the Note, referenced above in Paragraph 18, and (b) the performance of Dr.

Johnson's covenants and agreements under said Security Instrument and said Note.

Furthermore, Dr. Johnson did not question the legal description of the property in the Deed

of Trust, because, Weststar expressly intended that, *for the purpose referenced above*, Dr.

Johnson, as borrower, irrevocably grant and convey to the named Trustee and the named

Trustee's successors and assigns, with power of sale, the following property (and no other):

> **"The land referred to herein below is situated in the County of Brunswick State of North Carolina described as follows:**
>
> **Being all of Lots 13, 15 and 17, Block 186, Section N-6, Long Beach (now Oak Island) as per map for National Development Corp prepared by Howard M. Loughlin Registered Land Surveyor, recorded in Map Book 11, Page 89, office of the Register of Deeds for Brunswick County, North Carolina.**
>
> **Parcel ID: 235-IM-036, 2351M037**
>
> **This being the same property conveyed to Brad Johnson from Homer E. Wright, Jr., unmarried in a Deed dated August 2, 2012, recorded August 31, 2012, in Book 3329 Page 0354.**
>
> **Property Commonly Known As: 111 SouthEast 14th Street Oak Island, NC 28465**
>
> **which currently has the address of 111  SouthEast 14th Street Oak Island, NC 28465"**
> *See* Exhibit VII – Deed of Trust Dated July 19, 2013 and Recorded July 24, 2013.

21. Moreover, at closing, on July 19, 2013, to serve the purpose of the Security Instrument, as

    referenced in Paragraph 20, Dr. Johnson, as borrower, expressly intended to irrevocably grant

    and convey to the named Trustee and the named Trustee's successors and assigns, with

    power of sale, the following property (and no other):

"The land referred to herein below is situated in the County of Brunswick State of North Carolina described as follows:

Being all of Lots 13, 15 and 17, Block 186, Section N-6, Long Beach (now Oak Island) as per map for National Development Corp prepared by Howard M. Loughlin Registered Land Surveyor, recorded in Map Book 11, Page 89, office of the Register of Deeds for Brunswick County, North Carolina.

Parcel ID: 235-IM-036, 2351M037

This being the same property conveyed to Brad Johnson from Homer E. Wright, Jr., unmarried in a Deed dated August 2, 2012, recorded August 31, 2012, in Book 3329 Page 0354.

Property Commonly Known As: 111 SouthEast 14th Street Oak Island, NC 28465

which currently has the address of 111  SouthEast 14th Street Oak Island, NC 28465"
*See* Exhibit VII – Deed of Trust Dated July 19, 2013 and Recorded July 24, 2013.

22. After Dr. Johnson signed the closing documents, those closing documents were sent to Linear Title & Closing. Linear Title & Closing reviewed those closing documents, found no irregularities, proceeded with closing the transaction, and recorded the Note and Deed of Trust referenced in Paragraphs 16-18.

23. Through two letters dated August 8, 2013 and September 2, 2013, PennyMac notified Dr. Johnson that the Note referenced above in Paragraph 18 had been sold to PennyMac on August 6, 2013. *See* Exhibit IX – Letters from PennyMac to Dr. Johnson dated August 8, 2013 and September 2, 2013. In PennyMac's Letter dated September 2, 2013, PennyMac states:

"The purpose of this notice is to inform you that your mortgage loan referenced above was sold to PennyMac Loan Services, LLC ('PennyMac' or 'Creditor') on August 6, 2013. The Creditor also services your loan. Please note, this letter does not require any action to be taken on your part, but is simply a courtesy notification of the assignment, sale, or transfer of your mortgage loan. Below is PennyMac's contact information, should you have any questions or concerns about your loan.

The transfer of mortgage loans is a standard part of the mortgage business for many of the nation's mortgage lenders. **The transfer of your mortgage loan to the Creditor does not affect any terms or conditions of the Mortgage/Deed of Trust or Note. The transfer of ownership of your mortgage loan has not been publicly recorded.**" Bold Added.

Enclosed in the letter dated September 2, 2013 were the Deed of Trust referenced in

Paragraphs 16 & 17 and the Note referenced in Paragraph 18. Johnson relied on the veracity

and the substantive contents of the statements made by PennyMac in this letter.

24. On September 2, 2013, PennyMac had knowledge of the Property, described in Paragraph

17, which was the subject of the Security Instrument (i.e., Deed of Trust), referenced in

Paragraph 16, and that neither hazard property insurance nor flood insurance on Lots 16 & 18

would insure PennyMac's security interest in said Property (i.e., Lots 13, 15 & 17).

25. On September 20, 2017, in South Carolina, Dr. Johnson received an E-mail from PennyMac.

See Exhibit X – E-Mail from PennyMac to Dr. Johnson Dated September 20, 2017,

incorporated by reference herein, a true and correct copy.

26. Shortly after receiving the E-mail referenced above in Paragraph 25, Dr. Johnson called

PennyMac from South Carolina for the purpose of having PennyMac discontinue paying for

the Farm Bureau insurance policies, as of April (dwelling insurance) and May (flood

insurance), 2018, because Dr. Johnson's daughter was planning to enter college in Fall 2019

and Dr. Johnson wanted to decrease his expenses in preparation. Specifically, Dr. Johnson

from South Carolina spoke with a PennyMac employee/agent in the Escrow/Insurance Area

about discontinuing these insurance policies. This PennyMac employee/agent in the

Escrow/Insurance Area responded that such insurance was required. Dr. Johnson responded by saying that PennyMac only had a security interest in land, so that Dr. Johnson did not think that flood and dwelling insurance policies were required. The PennyMac employee/agent responded by saying that he would look into it (i.e., whether such insurance policies were required).

27. In all the alleged phone conversations with PennyMac, each PennyMac employee/agent in the Escrow/Insurance Area refused to give his/her full name. Accordingly, Dr. Johnson simply alleges that his call was made to a "PennyMac employee/agent in the Escrow/Insurance Area," when Dr. Johnson alleges with whom Dr. Johnson spoke and the specific response of said PennyMac employee/agent.

28. In April 2018, Dr. Johnson discovered that PennyMac paid to renew the Farm Bureau dwelling policy over Dr. Johnson's objections. As a result, Dr. Johnson was determined to close his escrow account and discontinue the insurance, himself. Accordingly, during the months of April – August, 2018, Dr. Johnson made several telephone calls from South Carolina to PennyMac employees/agents in the Escrow/Insurance Area concerning Dr. Johnson's request to close his escrow account. In each of those calls, Dr. Johnson stated that the escrow account was elective and that Dr. Johnson had determined that it was no longer needed. In addition, Dr. Johnson told each PennyMac employee/agent in the Escrow/Insurance Area that PennyMac only had a security interest in land, so that he did not think that flood and property insurance policies were required to insure PennyMac's beneficial interest in land.

29. Based upon the conversations referenced in Paragraph 28, on May 25, 2018, by Letter (transmitted by the U.S. Mails) dated May 25, 2018, PennyMac denied Dr. Johnson's request

to close his escrow account. *See* Exhibit XI – Determination Letters by PennyMac to Dr. Johnson (Dated May 25, 2018, August 31, 2018, and September 17, 2018) Regarding the Closing of Dr. Johnson's Escrow Account, incorporated by reference herein, a true and correct copy. However, on August 31, 2018 and September 17, 2018, by Letters (transmitted by the U.S. Mails) dated August 31, 2018 and September 17, 2018 to Dr. Johnson, PennyMac approved Dr. Johnson's request to close his escrow account, while, at the same time, in contravention of the terms and conditions of the Security Instrument, referenced in Paragraphs 16 & 17, and the Note, referenced in Paragraph 18, PennyMac stated that Dr. Johnson, individually, must pay for property insurance. *See* Exhibit XI – Determination Letters by PennyMac to Dr. Johnson (Dated May 25, 2018, August 31, 2018, and September 17, 2018) Regarding the Closing of Dr. Johnson's Escrow Account.

30. With regard to one of those telephone calls referenced in Paragraph 31, Dr. Johnson called a PennyMac employee/agent in the Escrow/Insurance Area on June 4, 2018 and told said employee/agent that PennyMac only had a security interest in vacant land, so that he did not think that flood and property insurance policies were required. In response, said PennyMac employee/agent in the Escrow/Insurance Area called Dr. Johnson on June 14, 2018 regarding a letter to be sent, via the U.S. Mails, by PennyMac to Dr. Johnson on June 15, 2018. *See* Exhibit XII – Letter Dated June 15, 2018 by PennyMac to Dr. Johnson Regarding the Trust Deed and Note, incorporated by reference herein, a true and correct copy. This letter enclosed the Trust Deed, referenced in Paragraphs 16 & 17, and Note, referenced in Paragraph 18, but the PennyMac employee/agent in the Escrow/Insurance Area intentionally omitted Schedule "A" of the Trust Deed in an attempt to defraud Dr. Johnson.

31. **Offer**. After September 17, 2018, Dr. Johnson had several telephone conversations with
PennyMac employees/agents in the Escrow/Insurance Area concerning Dr. Johnson's plan to
not renew the Farm Bureau insurance policies, as of April (dwelling insurance) and May
(flood insurance), 2019, because Dr. Johnson's daughter was planning to enter college in Fall
2019 and Dr. Johnson wanted to decrease his expenses in preparation. Specifically, in each of
those telephone calls made from South Carolina, Dr. Johnson inquired as to what kind of
insurance on vacant land would satisfy the performance of Dr. Johnson's covenants and
agreements under the Security Instrument, referenced in Paragraphs 16 & 17, and the Note,
referenced in Paragraph 18. PennyMac employees/agents in the Escrow/Insurance Area
responded by initially stating that insurance on the home, located on Lots 16 & 18, was
required to insure the vacant land on Lots 13, 15 & 17. However, in a second telephone
conversation with a female PennyMac employee/agent in the Escrow/Insurance Area, she
stated that if Dr. Johnson separated Lots 13, 15 & 17 from Lots 16 & 18, property insurance
on the home, located on Lots 16 & 18, would not be required to insure PennyMac's security
interest in the vacant land, i.e., Lots 13, 15 & 17. However, said PennyMac employee/agent
in the Escrow/Insurance Area stated that flood insurance would still be required unless
FEMA changed the flood zone designation.

32. **Acceptance**. Based upon the offer made by the PennyMac employee/agent in the
Escrow/Insurance Area, referenced in Paragraph 31, and in reliance thereof, on March 22,
2019, Dr. Johnson accepted PennyMac's offer by preparing and recording an Instrument of
Separation, which separated Lots 13, 15 & 17 from Lots 16 & 18, for property tax and
assessment purposes only. *See* Exhibit XIII – Instrument of Separation Recorded on March
25, 2019, incorporated by reference herein, a true and correct copy. As a result of such

separation, Brunswick County assigned (a) Parcel # 235IM2104 to Lots 13, 15, & 17, with an assessed valuation of $155,250, and (b) Parcel # 235IM21 to Lots 16 & 18, with an assessed valuation of $386,000. *See* Exhibit XIV – Notices of Real Estate Assessed Value, Brunswick County, North Carolina - The Result of the Instrument of Separation Recorded on March 25, 2019, incorporated by reference herein, a true and correct copy. Furthermore, such separation caused the creation of one undeveloped tax parcel (Parcel # 235IM2104) upon which the Town of Oak Island assessed an additional Sewer District Fee of over $600 per year.

33. **Breach of Contract Accompanied by Fraud; Breach of Contract (Deed of Trust); Quasi-Contract.** In contravention of the terms and conditions of the unilateral contract that Dr. Johnson made with PennyMac, as described in Paragraphs 31 & 32, and in contravention of the terms and conditions of the Security Instrument, referenced in Paragraphs 16 & 17, and the Note, referenced in Paragraph 18 (Breach of Contract (Deed of Trust)), PennyMac began sending threatening letters dated May 10, 2019 and June 14, 2019, via the U.S. Mails, demanding that Dr. Johnson buy property hazard insurance on his home on Lots 16 & 18, or else, suffer economic harm. Specifically, each of such letters threatened Dr. Johnson with economic harm unless Dr. Johnson purchased property hazard insurance on his home on Lots 16 & 18, which Dr. Johnson was under no obligation to do, as follows.

"REGARDING YOUR LOAN
Our records show that your Homeowners (Hazard) Insurance expired, and we do not have evidence that you have obtained new coverage.
WHY YOU RECEIVED THIS NOTICE
**Because Homeowners (Hazard) Insurance is required on your property, we plan to buy insurance for your property. You must pay us for any period during which the insurance we buy is in effect, but you do not have insurance.**
WHAT YOU SHOULD DO
You should immediately provide us with your insurance information. We require you to maintain Hazard insurance on your property at all times. Please provide a copy of your Insurance Policy Declarations Page, Evidence of Insurance, Binder, or other written confirmation from your insurance agent or carrier. This information must be in writing."

Bold added. *See* Exhibit XV - Letters Dated May 10, 2019 and June 14, 2019 from
PennyMac to Dr. Johnson, Demanding, Under Threat of Economic Harm, that Dr. Johnson
Buy Property Hazard Insurance, incorporated by reference herein, a true and correct copy.

34. In May, 2019, Dr. Johnson met twice with Claire, a Farm Bureau Insurance agent. Initially,

about May 13, 2019, Dr. Johnson met with Claire to explain Dr. Johnson's dispute with

PennyMac. Dr. Johnson explained to Claire that he wanted to discontinue paying for the

Farm Bureau flood and property insurance policies, as of April (dwelling insurance) and May

(flood insurance), 2019, because Dr. Johnson's daughter was planning to enter college in Fall

2019 and Dr. Johnson wanted to decrease his expenses in preparation. Furthermore, Dr.

Johnson explained that PennyMac only had a security interest in land, so that he did not think

that flood and property insurance policies were required to satisfy the performance of Dr.

Johnson's covenants and agreements under the Security Instrument, referenced in Paragraphs

16 & 17, and the Note, referenced in Paragraph 18. Moreover, Dr. Johnson stated that a

female PennyMac employee/agent in the Escrow/Insurance Area had told Dr. Johnson that if

he separated Lots 13, 15 & 17 from Lots 16 & 18, property insurance on the home, located

on Lots 16 & 18, would not be required to insure PennyMac's security interest in the vacant

land on Lots 13, 15 & 17, but that that flood insurance would still be required, unless FEMA

changed the flood zone designation. *See* Paragraph 31. Dr. Johnson then told Claire that Dr.

Johnson had separated Lots 13, 15 & 17 from Lots 16 & 18 in an Instrument of Separation

dated recorded on March 25, 2019 and referenced in Paragraph 32. Specifically, Dr. Johnson

asked Claire what kind of insurance on vacant land would satisfy the performance of Dr.

Johnson's covenants and agreements under the Security Instrument, referenced in Paragraphs

16 & 17, and the Note, referenced in Paragraph 18. Claire stated that she did not know of any

insurance that would insure PennyMac's security interest in vacant land, i.e., Lots 13, 15 &

17, but that Claire would attempt to contact the female PennyMac employee/agent in the Escrow/Insurance Area with whom Dr. Johnson had spoken.

35. On May 21. 2019, Dr. Johnson again met with Claire, a Farm Bureau Insurance agent. Claire stated that she had spoken with the female PennyMac employee/agent in the Escrow/Insurance Area, but that said PennyMac employee/agent was unyielding in requiring property and flood insurance on the home, located on Lots 16 & 18, to insure the vacant land on Lots 13, 15 & 17. Claire stated that she told said PennyMac employee/agent that she (Claire) could not write an insurance policy that would insure PennyMac's security interest in the vacant land on Lots 13, 15 & 17. After discussion with Claire and to partly satisfy the performance of Dr. Johnson's covenants and agreements under the Security Instrument, referenced in Paragraphs 16 & 17, and the Note, referenced in Paragraph 18 (Breach of Contract (Deed of Trust)), as interpreted by PennyMac, Dr. Johnson purchased a Personal Injury Coverage (PIC) policy and renewed his flood insurance on the home, located on Lots 16 & 18, to insure PennyMac's security interest in the vacant land on Lots 13, 15 & 17.

36. **Breach of Contract Accompanied by Fraud; Breach of Contract (Deed of Trust); Quasi-Contract.** In contravention of the terms and conditions of the unilateral contract that Dr. Johnson made with PennyMac (Breach of Contract Accompanied by Fraud), as described in Paragraphs 31 & 32, and in contravention of the terms and conditions of the Security Instrument, referenced in Paragraphs 16 & 17, and the Note, referenced in Paragraph 18, on July 16, 2019, PennyMac sent Dr. Johnson, via the U.S. Mails, a Certificate of Coverage Placement with respect to a Lender-Placed Hazard Insurance Policy, between PennyMac and SG Insurance, for the forced hazard insurance coverage for the improvements on Lots 16 & 18. Such Certificate states as follows.

"Re: Policy Number: MLR07769715085

Hazard Insurance Annual Premium amount under PENNYMAC LOAN SERVICES, LLC's Policy: **$2,880.00**

Hazard Insurance Coverage Amount under PENNYMAC LOAN SERVICES, LLC's Policy: **$369,500**
(This insurance may provide less coverage than was in effect previously.)

In case of loss, report it by calling 1-800-652-1262.

**REGARDING YOUR LOAN**

Our records indicate we have not been provided proof of acceptable homeowner's insurance on the above-referenced property in response to our prior notifications to you. **As you know, your loan agreement requires that you provide us with proof of acceptable and continuous homeowner's insurance on an annual basis.** As we have not received proof of acceptable homeowner's insurance coverage, which was requested in our prior notifications to you, **we have purchased a Lender-Placed Insurance to protect our interest in the dwelling structure, by advancing funds from your escrow account.**

**The Lender-Placed Insurance purchased includes coverage in the amount of $369,500 with an annual premium of $2,880.00.**

**WHAT THIS MEANS**

Enclosed you will find a copy of the Certificate of Insurance that has been purchased by PENNYMAC LOAN SERVICES, LLC. **For insurance coverage that we obtain for your Property (Lender-Placed Insurance), you will be responsible for reimbursing PENNYMAC LOAN SERVICES, LLC for the premium associated with such coverage.** The annual premium for this insurance will be paid from your escrow account. **If you did not have an escrow account, PENNYMAC LOAN SERVICES, LLC has established one for you and will provide you with an escrow analysis statement, which will explain the increase in your monthly payment to recover the amount advanced as well as future insurance payments.**

Please allow us to recap the important facts about Lender-Placed Insurance:

- This insurance may be more expensive and will likely provide less coverage than was previously in effect.

- **This insurance protects the dwelling structure at your expense.**

- **The Lender-Placed Insurance premium has been advanced from your escrow account. If you did not have an escrow account, PENNYMAC LOAN SERVICES, LLC has established one for you and will provide you**

**with an escrow analysis statement, which will explain the increase in your monthly payment to recover the amount advanced as well as future insurance payments. You will be responsible for any applicable taxes or fees, which result from the purchase of this insurance.**" Bold added. *See* Exhibit XVI – Certificate of Coverage Placement Dated July 16, 2019: A Lender-Placed Hazard Insurance Policy Between PennyMac and SG Insurance to Force Hazard Insurance Coverage on Dr. Johnson's Home on Lots 16 & 18, incorporated by reference herein, a true and correct copy.

37. **Breach of Contract Accompanied by Fraud; Breach of Contract (Deed of Trust); Quasi-Contract.** Also, in contravention of the terms and conditions of the unilateral contract that Dr. Johnson made with PennyMac (Breach of Contract Accompanied by Fraud), as described in Paragraphs 31 & 32, and in contravention of the terms and conditions of the Security Instrument, referenced in Paragraphs 16 & 17, and the Note, referenced in Paragraph 18 (Breach of Contract (Deed of Trust)), on July 16, 2019, beginning with PennyMac's Mortgage Activity Statement, dated July 16, 2019, and with PennyMac's Escrow Account Disclosure Statement, dated August 12, 2019, and continuing with PennyMac's Mortgage Activity Statements dated August 19, 2019 and September 17, 2019, where each of said statements was sent by PennyMac to Dr. Johnson via the U.S. Mails, PennyMac (a) charged Dr. Johnson $2880 for the Lender-Placed Hazard Insurance Policy between PennyMac and SG Insurance, referenced in Paragraph 36, to force hazard insurance coverage on Dr. Johnson's home on Lots 16 & 18, and (b) increased Dr. Johnson's monthly payment from $1506.82 to $2106.81. *See* Exhibit XVII - PennyMac's Mortgage Activity Statements Dated July 16, 2019, August 19, 2019 and September 17, 2019 and PennyMac's Escrow Account Disclosure Statement, Dated August 12, 2019.

38. On or about August 20, 2019, Dr. Johnson separately complained to (a) the North Carolina Commissioner of Banks and (b) the North Carolina Department of Insurance regarding the unlawful activities described above of (1) PennyMac (in contravention of the terms and

conditions of the unilateral contract that Dr. Johnson made with PennyMac, as described

above in Paragraphs 31 & 32, and in contravention of the terms and conditions of the

Security Instrument, referenced above in Paragraphs 16 & 17, and the Note, referenced above

in Paragraph 18) and (2) SG Insurance, respectively. In his Complaint, Dr. Johnson declared

as follows.

> "PennyMac has contracted with Standard Guaranty Insurance Company (Standard) for
> Standard to write a Residential Dwelling Certificate, i.e., a 'lender placed policy' (Policy
> Number MLR07769715085). However, **PennyMac has no insurable interest in the
> real property (dwelling) that is the object of the Residential Dwelling Certificate**.
> To make matters worse, PennyMac has increased the principal balance of the debt that
> [Dr. Johnson] owe[s] by over $2800 – the cost of the lender placed policy.
> The lender placed policy speaks of 'material misrepresentation' [paragraph 16(b)(2)].
> However, [Dr. Johnson has] tried twice to contact Standard to tell Standard about the
> material misrepresentation made by PennyMac. Standard will not talk to [Dr. Johnson]
> about the issue. **Standard says that [Dr. Johnson has] to talk to PennyMac**." Bold
> added. *See* Exhibit XVIII – Dr. Johnson's Complaint to the North Carolina Commission
> of Banks against PennyMac, Dated on or about August 20, 2019, Regarding the Unlawful
> Activities of PennyMac, incorporated by reference herein, a true and correct copy;
> Exhibit XIX – Dr. Johnson's Complaint to the North Carolina Department of Insurance
> against SG Insurance, Dated on or about August 20, 2019, Regarding the Unlawful
> Activities of SG Insurance, incorporated by reference herein, a true and correct copy.

39. On September 5, 2019, Mr. Saldivar, an employee/agent of PennyMac, responded to Dr.

Johnson by Letter, transmitted via the U.S. Mails, regarding the Complaint that Dr. Johnson

filed with the North Carolina Commission of Banks, which is referenced above in Paragraph

38. Mr. Saldivar stated that Dr. Johnson was "paid through August 2019" (i.e., was not in

default) and, as proof, Mr. Saldivar included (a) a "Customer Account Activity Statement"

and (b) the Note, referenced above in Paragraph 18. *See* Exhibit XX – Letter Dated

September 5, 2019, from PennyMac to Dr. Johnson Regarding the Complaint to the North

Carolina Commission of Banks that Dr. Johnson filed against PennyMac, incorporated by

reference herein, a true and correct copy.

40. **Breach of Contract Accompanied by Fraud; Breach of Contract (Deed of Trust);**

    **Quasi-Contract.** In contravention of the terms and conditions of the unilateral contract that

    Dr. Johnson made with PennyMac (Breach of Contract Accompanied by Fraud), as described

    in Paragraphs 31 & 32, and in contravention of the terms and conditions of the Security

    Instrument, referenced in Paragraphs 16 & 17, and the Note, referenced in Paragraph 18, on

    September 19, 2019, Mr. Saldivar, an employee/agent of PennyMac, responded to the North

    Carolina Commission of Banks by Letter, transmitted via the U.S. Mails, regarding the

    Complaint that Dr. Johnson filed with the North Carolina Commission of Banks, which is

    referenced above in Paragraph 38. Mr. Saldivar states that "a title claim has been filed" with

    Linear Title & Closing (*which was subsequently denied*) and that PennyMac "reserves the

    right to seek reimbursement from Mr. Johnson." *See* Exhibit XXI – Letter Dated September

    19, 2019, from PennyMac to the North Carolina Commission of Banks Regarding the

    Complaint to the North Carolina Commission of Banks that Dr. Johnson filed against

    PennyMac, incorporated by reference herein, a true and correct copy.

41. On August 30, 2019 and September 26, 2019, Mrs. Sanchez, an employee/agent of SG

    Insurance and Assurant, responded to the North Carolina Department of Insurance by Letter,

    transmitted via the U.S. Mails, regarding the Complaint that Dr. Johnson filed with the North

    Carolina Department of Insurance, which is referenced above in Paragraph 38. In her Letter

    dated September 26, 2019, Mrs. Sanchez states as follows.

"**[Assurant and SG Insurance] have worked closely with PennyMac,** who is the lender and named insured on our policy **to reach a conclusion for Mr. Johnson**. [Assurant and SG Insurance] understand that **PennyMac is fully aware of Mr. Johnson's complaint** and **working to resolve the issue** with respect to the title, legal descriptions and status of any improvements on the mortgaged property in question. **The lender placed Fire/Allied certificate** (numbered MLR07769715085) that was issued on Mr. Johnson's property, 111 Se 14th Street, Oak Island, NC 28465 with an inception date of May 9, 2019 **remains in effect at this time, at the direction of PennyMac,** until their research is completed and a definitive resolution to Mr. Johnson's concerns is finalized. Should PennyMac's research indicate that the insurance with Standard Guaranty was not necessary it will be adjusted accordingly. **Until such resolution is concluded, the insurance will remain in effect. . .**
**We continue to strongly believe that PennyMac is the sole party who can conclusively address any issues pertaining to the servicing of Mr. Johnson's mortgage loan. A final resolution to these matters will be best reached by Mr. Johnson continuing to work directly with PennyMac.** He may contact Mr. Efren Saldivar with PennyMac at 866-695-4122 ext. 2319 for further assistance." Bold added. *See* Exhibit XXII – Letters Dated August 30, 2019 and September 26, 2019, from SG Insurance to the North Carolina Department of Insurance Regarding the Complaint to the North Carolina Department of Insurance that Dr. Johnson filed against SG Insurance, incorporated by reference herein, a true and correct copy.

42. On October 2, 2019, the Office of the North Carolina Commissioner of Banks responded to the Complaint filed by Dr. Johnson, which is referenced above in Paragraph 38, by Letter dated October 2, 2019 from the North Carolina Commissioner of Banks to Dr. Johnson. Said Letter to Dr. Johnson states as follows.

"**If you are not satisfied** with [PennyMac's] reply, please contact the company directly. Also, should you wish to pursue this matter further, **you may want to consider consulting with a private attorney or legal services provider to determine if you have private legal rights or remedies.**" Bold added. *See* Exhibit XXIII – Letter Dated October 2, 2019, from the North Carolina Commissioner of Banks to Dr. Johnson, Regarding the Complaint against PennyMac that Dr. Johnson filed with the North Carolina Commission of Banks, incorporated by reference herein, a true and correct copy.

43. Since October 2, 2019 through February 13, 2020, Dr. Johnson has placed a multitude of telephone calls to both (a) Mr. Saldivar of PennyMac at 866-695-4122 ext. 2319 and (b) Mrs. Sanchez of Assurant and SG Insurance at 714.338.7720. In each of those calls, Dr. Johnson

failed to reach the person called directly, so Dr. Johnson left a message. Several of the

messages to both (a) Mr. Saldivar of PennyMac and (b) Mrs. Sanchez of Assurant and SG

Insurance reiterated that PennyMac only has a security interest in land, so that flood and

property insurance policies are not required to satisfy the performance of Dr. Johnson's

covenants and agreements under the Security Instrument, referenced in Paragraphs 16 & 17,

and the Note, referenced in Paragraph 18. Furthermore, Dr. Johnson further stated that

PennyMac was purposefully and intentionally misrepresenting the facts to SG Insurance and

Assurant, thereby making the lender-placed insurance policy invalid, under its terms. In all of

his messages, Dr. Johnson requested a return telephone call at 843.661.1427. Neither Mr.

Saldivar nor Mrs. Sanchez returned any of Dr. Johnson's telephone calls. Instead, on October

17, 2019, PennyMac obtained a fraudulent Assignment of Deed of Trust from the Mortgage

Electronic Registration Systems, Inc. (MERS), whereupon, on November 4, 2019, PennyMac

recorded such Assignment in the North Carolina Register of Deeds, Brunswick County. *See*

Exhibit XXIV - Assignment of Deed of Trust, to PennyMac from the Mortgage Electronic

Registration Systems, Inc. (MERS), Dated October 17, 2019 and Recorded on November 4,

2019. Such Assignment of Deed of Trust falsely identifies the Property Address as "111

SOUTHEAST 14TH STREET, OAK ISLAND, NORTH CAROLINA 28465," whereas the

current address of the Property Address is on SE 13th Street in Oak Island, NC  28465, which

is well-known to PennyMac.

44. On January 23, 2020, PennyMac filed an action for the reformation of a Deed of Trust

(registered in Brunswick County, North Carolina) against Dr. Johnson and his wife, Elci

Wijayaningsih, in the District Court Division of the General Court of Justice in Forsyth

County, North Carolina, file number 20 CVD 436:

a. *falsely* declaring that "**Pursuant to North Carolina General Statutes §1-82, venue is proper in this Court**" and

b. alleging that –

   i. "**Through mutual mistake, inadvertence or mistake of the draftsman, the legal description in the Deed of Trust omitted any reference to "Lots 16 and 18"** and

   ii. "As a result of the foregoing mutual mistake, inadvertence or mistake of the draftsman, **the legal description attached to the Deed of Trust does not reflect the true intentions of the parties as of the date of execution of the Deed of Trust**." Bold added.

45. Moreover, on January 23, 2020, PennyMac's attorney filed a *Notice of Lis Pendens* in the Office of the Clerk of Superior Court of Brunswick County, North Carolina, declaring that "The Plaintiff [PennyMac] has instituted a civil action in the District Court Division of the General Court of Justice in Forsyth County, North Carolina, file number 20 CVD 436 against Defendants Brad Johnson and Elci Wijayaningsih" Here, PennyMac speculated that Dr. Johnson and his wife would lack the capacity to defend against the false allegations of PennyMac in its Complaint. Clearly, the State of North Carolina, Forsyth County District Court, lacks venue, since there is not one allegation of fact by any party that implicates Forsyth County. Because of the *Notice of Lis Pendens* and PennyMac's meritless reformation claim against Dr. Johnson, Dr. Johnson is prohibited from refinancing his Note with PennyMac to take advantage of the low rates and save over $25,000 in interest charges.

46. As stated above in Paragraphs 25 – 43, inclusive, the facts, as alleged, demonstrate a pattern of extortion (i.e., the practice of obtaining (or attempting to obtain) something, especially money, through force or threats) accomplished in a hierarchical setting, by (a) PennyMac and

its employees/agents (e.g., Mr. Saldivar) and (b) Assurant and SG Insurance and their employees/agents (e.g., Mrs. Sanchez). In the past 10 years, PennyMac, Assurant and SG Insurance have applied such practice to many debtors with success, in cases where PennyMac, as assignee of a Mortgage or Deed of Trust, is simply dissatisfied with the recorded security interest that PennyMac has been assigned under the controlling legal documents (i.e., Mortgage or Deed of Trust) associated with a Note purchased in an arms-length transaction. In other words, such conduct of PennyMac, Assurant and SG Insurance was committed or performed with such frequency as to indicate a general business practice among them since 2012. *See Rutter v. MERS*, 2012 R.I. Super. LEXIS 39 (March 12, 2012); *Pennymac Holdings LLC v. Spencer*, 2015 Conn. Super. LEXIS 3282 (Judicial District of Fairfield, at Bidgeport: Docket No. FBTCV146043738S, October 13, 2015); *PennyMac Corp. v. Chavez*, 144 A.D.3d 1006, 42 N.Y.S.3d 239, 2016 N.Y. App. Div. LEXIS 7783 (November 23, 2016); *Pennymac Loan Servs. v. Denman*, 2017 Ohio Misc. LEXIS 14952 (February 9, 2017); *Pennymac Loan Servs. v. Gamble*, 2017 Ohio Misc. LEXIS 19522 (September 1, 2017); *FNBN 1, LLC v. Persaud*, 2017 N,Y. Mis. LEXIS 5332 (December 4, 2017); *Pennymac Loan Servs. v. Infante*, 2017 Ohio Misc. LEXIS 5351 (December 14, 2017); *Pennymac v. Neff*, et al., 2020 Pa. Super. Unpub. LEXIS 625 (February 20, 2020).

47. On February 21, 2020, Johnson filed a compulsory counterclaim against PennyMac, Assurant and SG Insurance under Rules 13(a) & 14(a) of the North Carolina Rules of Civil Procedure, since, at the time of serving PennyMac's reformation claim against Johnson and his wife, the counterclaim arises out of the same set of facts that is the subject matter of PennyMac's reformation claim and Johnson's affirmative defenses.

## THE CONDUCT OF PENNYMAC, ASSURANT AND SG INSURANCE CONTINUES AFTER FEBRUARY 21, 2020

The conduct of PennyMac, Assurant and SG Insurance referenced above continued after Johnson's counterclaim was filed on February 21, 2020, constituting a distinct threat of continuing, long-term racketeering activity, as follows.

48. **Breach of Contract Accompanied by Fraud; Breach of Contract (Deed of Trust); Quasi-Contract.** In contravention of the terms and conditions of the unilateral contract that Dr. Johnson made with PennyMac, as described in Paragraphs 31 & 32, and in contravention of the terms and conditions of the Security Instrument, referenced in Paragraphs 16 & 17, and the Note, referenced in Paragraph 18, Assurant, on behalf of PennyMac, sent another threatening letter to Dr. Johnson, dated March 2, 2020, via the U.S. Mails, demanding that Dr. Johnson buy property hazard insurance on his home on Lots 16 & 18, or else, suffer economic harm. More specifically, such letter threatened Dr. Johnson with economic harm unless Dr. Johnson purchased property hazard insurance on his home on Lots 16 & 18, which Dr. Johnson was under no obligation to do, as follows.

> "Your insurance certificate is due to renew on 05/09/2020. If the Named Insured Mortgagee renews the lender placed insurance certificate on your property, it may be renewed with a change in premium. It may also have a change in deductible(s). **This insurance certificate was purchased on your behalf because you did not maintain insurance coverage on your property as required by the terms of your loan**. If you purchase other insurance coverage on your property prior to the renewal date, please mail a copy of the policy to the above Named Insured Mortgagee [Pennymac Loan Services, LLC]." Bold added. *See* Exhibit XXV - Letter Dated March 2, 2020 from Assurant, on Behalf of PennyMac, to Dr. Johnson, Demanding, Under Threat of Economic Harm, that Dr. Johnson Buy Property Hazard Insurance, incorporated by reference herein, a true and correct copy.

Here, Assurant and SG Insurance continue to perpetrate the fraud on behalf of PennyMac.

49. **Breach of Contract Accompanied by Fraud; Breach of Contract (Deed of Trust);**

**Quasi-Contract.** In contravention of the terms and conditions of the unilateral contract that

Dr. Johnson made with PennyMac, as described in Paragraphs 31 & 32, and in contravention

of the terms and conditions of the Security Instrument, referenced in Paragraphs 16 & 17,

and the Note, referenced in Paragraph 18, PennyMac sent another threatening letter dated

March 20, 2020, via the U.S. Mails, demanding that Dr. Johnson buy property hazard

insurance on his home on Lots 16 & 18, or else, suffer economic harm. More specifically,

such letter threatened Dr. Johnson with economic harm unless Dr. Johnson purchased

property hazard insurance on his home on Lots 16 & 18, which Dr. Johnson was under no

obligation to do, as follows.

"REGARDING YOUR LOAN
Because we did not have evidence that you had Homeowners (Hazard) Insurance on the
property listed above, **we bought insurance on your property and added the cost to your
mortgage loan account.**
WHY YOU RECEIVED THIS NOTICE
. . . **Because Homeowners (Hazard) Insurance is required on your property, we intend
to maintain insurance on your property by renewing or replacing the insurance we
bought**. . .
WHAT YOU SHOULD DO
We require you to maintain Hazard insurance on your property at all times. Please provide a
copy of your Insurance Policy Declarations Page, Evidence of Insurance, Binder, or other
written confirmation from your insurance agent or carrier. This information must be in
writing." Bold added. *See* Exhibit XXVI - Letter Dated March 20, 2020 from PennyMac to
Dr. Johnson, Demanding, Under Threat of Economic Harm, that Dr. Johnson Buy Property
Hazard Insurance, incorporated by reference herein, a true and correct copy.

50. **Breach of Contract Accompanied by Fraud; Breach of Contract (Deed of Trust);**

**Quasi-Contract.** In contravention of the terms and conditions of the unilateral contract that

Dr. Johnson made with PennyMac, as described in Paragraphs 31 & 32, and in contravention

of the terms and conditions of the Security Instrument, referenced in Paragraphs 16 & 17,

and the Note, referenced in Paragraph 18, in PennyMac's Mortgage Activity Statements,

dated May 16, 2020, June 16, 2020 and July 16, 2020, where each of said statements was

sent by PennyMac to Dr. Johnson via the U.S. Mails, PennyMac (a) charged Dr. Johnson

$3137 to renew the Lender-Placed Hazard Insurance Policy between PennyMac and SG

Insurance, referenced in Paragraph 39, to force hazard insurance coverage on Dr. Johnson's

home on Lots 16 & 18, and (b) reestablished, and then charged, an escrow account for Dr.

Johnson in the amount of $3137. *See* Exhibit XXVII - PennyMac's Mortgage Activity

Statements Dated May 16, 2020, June 16, 2020 and July 16, 2020, incorporated by reference

herein, a true and correct copy.

51. **Breach of Contract Accompanied by Fraud; Breach of Contract (Deed of Trust);**

**Quasi-Contract.** In contravention of the terms and conditions of the unilateral contract that

Dr. Johnson made with PennyMac (Breach of Contract Accompanied by Fraud), as described

in Paragraphs 31 & 32, and in contravention of the terms and conditions of the Security

Instrument, referenced in Paragraphs 16 & 17, and the Note, referenced in Paragraph 18, by

using the U.S. wires, PennyMac withdrew $2138.56 (rather than $1506.82) from the South

Carolina bank (First Citizens Bank) account of Dr. Johnson. In other words, by electronic

means, PennyMac took $631.74 out of the South Carolina bank account of Dr. Johnson

without either authority or permission from either the South Carolina bank or Dr. Johnson.

*See* Exhibit XXVIII – Transactions affecting the Bank Account of Brad Johnson during the

period September 11-16, 2020, incorporated by reference herein, a true and correct copy.

## COUNT I
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
## (18 U.S.C. §§ 1961-1968)

52. Count I of this Complaint *arises* out of **schemes and artifices** executed by employee/agents

of Defendants, PennyMac, SG Insurance, and Assurant (including Mr. Saldivar and Ms.

Sanchez), through mail and wire communications and by fraudulent and extortionate means,

within an *organizational nexus*, to unlawfully deprive (or attempt to deprive) Dr. Johnson

(and other debtors similarly situated), of money and a beneficial interest in real property,

where, over the last ten years, these **schemes and artifices** have been employed by said

Defendants, within an organizational nexus, to deprive (or attempt to deprive) other persons

similarly situated of money and their beneficial interests in real property. The first 2 claims

under Count I are private (civil) causes of action arising under the provisions of the

Racketeer Influenced and Corrupt Organizations Act of 1970 (RICO), 18 U.S.C. §§ 1961-

1968 (1994), where in bringing Count I, Dr. Johnson seeks to recover statutory damages

under 18 U.S.C. § 1964(c) (1994), along with the costs of this suit, interest and reasonable

attorneys' fees (if attorneys' fees are incurred by Dr. Johnson) for Defendants' violations of

the provisions of RICO.

53. **Count I(a)**. In Count I(a), Dr. Johnson alleges that each of the Defendants, PennyMac, SG

Insurance and Assurant, violated 18 U.S.C. § 1962(c) by conducting or participating in the

conduct of the affairs of an enterprise through a pattern of racketeering activity, where at

least two acts of racketeering activity per Defendant are specifically alleged. Specifically,

each of the Defendants, PennyMac, SG Insurance and Assurant, conducted or participated in

the conduct of the affairs of The PennyMac Association-in-Fact RICO Enterprise by

engaging in the RICO predicate acts of mail and wire fraud (pursuant to 18 U.S.C. §§ 1341

and 1343) and Hobbs Act (18 U.S.C. § 1951) extortion, constituting a pattern of racketeering activity, to defraud and threaten Dr. Johnson for the purpose of obtaining (or seeking to obtain) from Dr. Johnson, money and a beneficial interest in real property (i.e., control over Dr. Johnson's real property (Lots 16 & 18)), thereby depriving (or seeking to deprive) Dr. Johnson of said money and other economic property rights, including exclusivity over his real property (Lots 16 & 18).

54. **Count I(b)**. In Count I(b), Dr. Johnson alleges that each of the Defendants, PennyMac, SG Insurance and Assurant, violated 18 U.S.C. § 1962(d) by agreeing to and conspiring with others to conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity, where at least two acts of racketeering activity per Defendant are specifically alleged. Specifically, each of the Defendants, PennyMac, SG Insurance and Assurant, agreed to and conspired with others to participate in the conduct of the affairs of The PennyMac Association-in-Fact RICO Enterprise by engaging in the RICO predicate acts of mail and wire fraud (pursuant to 18 U.S.C. §§ 1341 and 1343) and Hobbs Act (18 U.S.C. § 1951) extortion, constituting a pattern of racketeering activity, to defraud and threaten Dr. Johnson for the purpose of obtaining (or seeking to obtain), from Dr. Johnson, money and control over Dr. Johnson's real property (Lots 16 & 18), thereby depriving Dr. Johnson of said money and other economic property rights, including exclusivity over his real property (Lots 16 & 18).

55. **Jurisdiction, Venue and Standing.** Federal Question Jurisdiction of this Court is proper under 28 U.S.C. § 1331. In addition, Diversity Jurisdiction of this Court is proper under 28 U.S.C. § 1332, where this action is of a civil nature involving exclusive of interest and costs, an amount in controversy in excess of $75,000. This Court has personal jurisdiction over

Defendants pursuant to (1) 18 U.S.C. § 1965(b) and/or (2) 18 U.S.C. § 1965(d). Venue is proper in this Court, since the facts (including of damages), as alleged have occurred within the boundaries of the State of South Carolina. Dr. Johnson has standing to bring this claim pursuant to 18 U.S.C. § 1964(c) because Dr. Johnson has been injured in his property by reason of a violation of 18 U.S.C. § 1962, as provided below.

56. Dr. Johnson repeats and re-alleges each of the allegations contained in paragraphs 2 through 51 as if fully set forth herein.

57. **Person.** Dr. Johnson is (and was at all relevant times) a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c). Each of the Defendants is (and was at all relevant times) a "person" within the meaning of RICO U.S.C. §§ 1961(3) and 1962(c).

58. **The RICO Enterprise.** Through their relationships within the forced, lender- placed insurance system, PennyMac, Assurant and SG Insurance formed an association-in-fact RICO enterprise (hereinafter "The PennyMac Association-in-Fact RICO Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Dr. Johnson alleges that The PennyMac Association-in-Fact RICO Enterprise ("the *Enterprise*") used the forced, lender-placed insurance system as a vehicle for the shared purpose of (1) unlawfully making money (unlawfully obtaining Dr. Johnson's money) and (2) controlling Dr. Johnson's real property (Lots 16 & 18), where the schemes and artifices to accomplish the *Enterprise*'s common purpose included:

- Obtaining money by perpetuating the false narrative (*see* Threshold #1&2, below) that Johnson had to have hazard insurance with respect to the improvements on Lots 16 & 18, because PennyMac had a security (insurable) interest in Lots 13, 15 & 17. *See* Para. 26-28, above.

- Obtaining control over Lots 16 & 18 by perpetuating the false narrative (*see* Threshold #1&2, below) that Johnson had to have hazard insurance with respect to the improvements on Lots 16 & 18, because PennyMac had a security (insurable) interest in Lots 13, 15 & 17. *See* Para. 29-31, above.

- Extorting money by threat of economic harm, using the false narrative (*see* Threshold #1&2, below) that Johnson had to have hazard insurance with respect to the improvements on Lots 16 & 18, because PennyMac had a security (insurable) interest in Lots 16 & 18. *See* Para. 36-40, 49-50, above.

- Obtaining control over Lots 16 & 18 by perpetuating the false narrative (*see* Threshold #1&2, below) that Johnson had to have hazard insurance with respect to the improvements on Lots 16 & 18, because PennyMac had a security (insurable) interest in Lots 16 & 18. *See* Para. 33-37, 39-41, 43-44, 48-51, above.

At all relevant times, PennyMac, Assurant and SG Insurance were persons [Para. 57], distinct from the *Enterprise* and associated with the *Enterprise*'s "forced, lender-placed insurance program" [Para. 41], because each of said defendants operated the above schemes for a shared purpose, through its relationship within said program. Assurant caused SG Insurance to be formed to exclusively contract with PennyMac to provide PennyMac with hazard insurance on real property improvements that PennyMac identified in its sole discretion. In their Property and Casualty Complaint Department, "[Assurant and SG Insurance] have worked closely with PennyMac" to address any complaints. *Id*. The *Enterprise* accomplishes its shared purpose by creating a climate of intimidation through a pattern of racketeering activity that includes systematic extortion and fraud, using actual and threatened economic injury and fear. Within this context, Defendants, PennyMac, SG Insurance, and Assurant, constitute a group of persons

associated together in fact for the common purpose of carrying out the **fraudulent schemes and artifices** described above to deprive (or attempt to deprive) Dr. Johnson of his interest in property, where over the last ten years, these **schemes and artifices** have been employed by these Defendants to deprive (or attempt to deprive) other persons similarly situated of their interests in property. As shown, The PennyMac Association-in-Fact RICO Enterprise has been described as an ongoing structure of persons, associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making. Further, differentiation among roles exists between and among the employee/agents of the Defendants, PennyMac, SG Insurance, and Assurant, conducting or participating in the conduct of the affairs of The PennyMac Association-in-Fact RICO Enterprise. Finally, the fact that PennyMac, Assurant and SG Insurance are operating this "forced, lender-placed insurance program" [Para.41] is evidence of "**longevity sufficient to permit these associates to pursue the enterprise's purpose.**"

59. **Interstate Commerce.** At all relevant times, The PennyMac Association-in-Fact RICO Enterprise was engaged in, and its activities affected, interstate commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

60. **Respondeat Superior – Defendants, PennyMac, SG Insurance, and Assurant**. Since:

   **a.** Each of the Defendants, PennyMac, SG Insurance, and Assurant, only acts through its agents;

   b. Each act of an Agent/Employee of Defendant, PennyMac, SG Insurance, or Assurant, herein described, was:

      (1) Related to and committed within the course and scope of employment,

36

(2) Committed in furtherance of the interests and economic benefits of said Defendant, PennyMac, SG Insurance, or Assurant, and

(3) Authorized or subsequently acquiesced by said Defendant, PennyMac, SG Insurance, or Assurant (as shown, by perpetuating the fraud, each of the Defendants (PennyMac, SG Insurance, and Assurant) has acquiesced to each and every act of its agents);

c.  Defendant, PennyMac, SG Insurance, or Assurant, derived some benefit from each act committed by said Agent/Employee of Defendant, PennyMac, SG Insurance, or Assurant, herein described; and

d.  Under the doctrines of respondeat superior and vicarious liability, the acts of Agent/Employees of Defendant, PennyMac, SG Insurance, or Assurant, herein described:

(1) are deemed to be the acts of said Defendant, PennyMac, SG Insurance, or Assurant,

(2) are chargeable to said Defendant, PennyMac, SG Insurance, or Assurant, and

(3) are binding upon said Defendant, PennyMac, SG Insurance, or Assurant,

where Defendants, PennyMac, SG Insurance, and Assurant, are **each** vicariously responsible for the wrongful acts of its agent/employees and imposing vicarious liability upon each of Defendants, PennyMac, SG Insurance, and Assurant, is not inconsistent with the intent of Congress.

## Count I(a)

61. Defendants, PennyMac, SG Insurance, and Assurant conducted or participated, directly or indirectly, in the conduct of the affairs of The PennyMac Association-in-Fact RICO Enterprise through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961 (5), in violation of RICO, 18 U.S.C. § 1962(c).

THRESHOLD ISSUE #1:
PENNYMAC HAS NO SECURITY INTEREST, INSURABLE INTEREST OR
REAL PROPERTY INTEREST IN LOTS 16 & 18
(AND THE REAL PROPERTY IMPROVEMENTS CONTAINED THEREIN)

62. On November 7, 2008, Johnson made a cash purchase of Lots 16 and 18 (and the real property improvements contained therein). Para. 6. Johnson immediately purchased homeowner's and flood insurance for said improvements from the Farm Bureau Insurance Company. Para. 8.

63. About August 25, 2012, Johnson made a cash purchase of Lots 13, 15 & 17 (vacant land contiguous to Lots 16 & 18) from Homer E. Wright, Jr. Para. 8.

64. To avoid Oak Island's Sewer District Fee/Tax on undeveloped parcels, on June 13, 2013, Johnson combined Lots 13, 15 & 17 and Lots 16 & 18 into one developed parcel for tax purposes only. Para. 9.

65. As a result of a careful, thorough and detailed evaluation (and multiple quality reviews) of Johnson's loan application between June 9, 2013 and July 17, 2013 (Para. 10-15, 19-22), Weststar Mortgage, Inc. (hereinafter "WM") offered Johnson a loan under specified, preprinted terms. In particular, Johnson unilaterally elected to have WM set up an escrow account so that Johnson would pay property taxes and insurance on a monthly basis for the entire combined tax parcel, i.e., Lots 13, 15 & 17 and Lots 16 & 18.

66. On July 19, 2013, Johnson accepted WM's exclusive loan offer by individually executing a

note ("Note") in favor of WM, which referred to a deed of trust ("Deed of Trust") to be

executed by Johnson (and his wife) to protect the Note Holder. Para. 18. Contemporaneously,

Johnson and his wife (Wijayaningsih) executed the Deed of Trust with specified, preprinted

terms, even though Wijayaningsih (a) is not obligated (a debtor) on the Note and (b) has no

ownership interest in either Lots 13, 15 & 17 or Lots 16 & 18. Para. 16-17, Exhibit VII. The

Deed of Trust named Mortgage Electronic Registration Systems, Inc. (MERS), and its

successors and assigns, as the nominee for the Lender and as the beneficiary of the Deed of

Trust. *Id.* The Deed of Trust expressly grants MERS the right to assign its security interest in

Lots 13, 15 & 17 and the right to enforce the Deed of Trust. *Id.* Furthermore, the Deed of

Trust provides in pertinent part:

- "Borrower irrevocably grants and conveys to Trustee and Trustee's successors and
  assigns, in trust, with power of sale," **[Lots 13, 15 & 17]**." *Id.* at Transfer of Rights in the
  Property.

- "Borrower understands and agrees that **MERS holds only legal title to the interests
  granted by Borrower** in this Security Instrument . . ." Bold added. *Id.*

- "**Borrower shall keep the improvements now existing or hereafter erected on [Lots
  13, 15 & 17] insured** against loss by fire, hazards . . . This **insurance shall be
  maintained** in the amounts (including deductible levels) and for the periods **that Lender
  requires**." Bold added. *Id.* at para. 8 (Uniform Covenants).

- "**If borrower fails to maintain any of the coverages described above**, Lender may
  obtain insurance coverage, at Lender's option and Borrower's expense. . . **Any amounts
  dispersed by Lender under this Section 5 shall become additional debt of Borrower**

secured by this Security Instrument. These amounts shall bear interest at the Note rate

from the date of disbursement, and shall be payable, with such interest, upon Notice from

Lender to Borrower requesting payment." Bold added. *Id.*

67. In an arm's length transaction, on August 6, 2013, PennyMac purchased the Note. Para. 23-

24, Exhibit IX. In two letters dated August 8, 2013 and September 2, 2013, PennyMac

notified Johnson of this fact and that "**[t]he transfer of your mortgage loan to the Creditor**

**does not affect any terms or conditions of the Mortgage/Deed of Trust or Note**." *Id.*

Johnson relied on this statement. *Id.* Also, on September 2, 2013, PennyMac knew that it had

a security interest, insurable interest and real property interest in Lots 13, 15 & 17 [NOT Lots

16 & 18] and that neither hazard property insurance nor flood insurance would insure

PennyMac's security interest in [Lots 13, 15 & 17, as vacant land]. *Id.*

68. On October 17, 2019, MERS, as beneficiary and as nominee for Lender, executed a

fraudulent Assignment of Deed of Trust, assigning and transferring to PennyMac all

beneficial interest under the Deed of Trust. Para. 43. Exhibit XXIV. By reason of such

fraudulent assignment, PennyMac purportedly acquired MERS' rights (and only those rights)

under the Deed of Trust, as beneficiary and as nominee for Lender. However, the Deed of

Trust neither concerns, nor relates to, in any respect, Lots 16 & 18, and vice versa. *See* Para.

13-14, Exhibit VII.

69. Therefore, based upon the foregoing verified facts, PennyMac has no security interest,

insurable interest or real property interest in Lots 16 & 18 (and the real property

improvements contained therein). PennyMac has confirmed this fact in its state reformation

claim against Johnson. ["Plaintiff has no adequate remedy at law."] Furthermore, on

September 2, 2013, PennyMac knew (1) that it had a security interest, insurable interest and

real property interest in Lots 13, 15 & 17 [NOT Lots 16 & 18] and (2) that neither hazard

property insurance nor flood insurance would insure PennyMac's security interest in [Lots

13, 15 & 17, as vacant land]. Para. 23-24, Exhibit IX.

**THRESHOLD ISSUE #2:**
ON AUGUST 30, 2019, ASSURANT AND SG INSURANCE KNEW
THAT PENNYMAC HAD MISREPRESENTED TO THEM
THAT PENNYMAC HAD A SECURITY INTEREST, INSURABLE INTEREST AND
REAL PROPERTY INTEREST IN LOTS 16 & 18
(AND THE REAL PROPERTY IMPROVEMENTS CONTAINED THEREIN)

70. On July 16, 2019, PennyMac contracted with SG Insurance to write an unlawful lender

placed policy ("Policy") with regard to the real property improvements contained within Lots

16 & 18. Para. 36, Exhibit XVI.

71. About August 20, 2019, Johnson complained to the North Carolina Department of Insurance

because PennyMac has no insurable interest in the real property (dwelling) that is the object

of the Policy, i.e., the real property improvements contained within Lots 16 & 18. Para. 38,

Exhibit XIX.

72. On August 30, 2019 and September 26, 2019, Assurant and SG Insurance jointly responded

to Johnson's complaint. Para. 41, Exhibit XXII. Even though Assurant and SG Insurance

each knew that PennyMac had purposefully and intentionally misrepresented to them that

PennyMac has an insurable interest in Lots 16 & 18, they each purposefully and intentionally

kept the Policy "**in effect . . . at the direction of PennyMac**," rather than  cancelling the

Policy under its terms (Policy: "[w]e may cancel this Certificate  . . . for . . . the following

reasons . . . An act or omission by you or your representative that constitutes material

representation . . ." [para. 16(b)(2)(b)] ). Para. 36, 38, 41 & 43, Exhibits XVI, XIX & XXII.

73. Therefore, based upon the foregoing verified facts, on August 30, 2019, Assurant and SG
    Insurance each knew that PennyMac had misrepresented to them that PennyMac had a
    security interest, insurable interest and real property interest in Lots l6 & 18 (and the real
    property improvements contained therein). Para. 41, Exhibit XXII. Furthermore, instead of
    canceling the Policy under its terms, Assurant and SG Insurance kept the Policy "**in effect . .
    . at the direction of PennyMac**." Para. 36, 38, 41 & 43, Exhibits XVI, XIX & XXII.

DR. JOHNSON PLEADS
A (PATTERN OF) "RACKETEERING ACTIVITY" ELEMENT – PREDICATE ACTS

**Dr. Johnson Pleads Federal Mail (Wire) Fraud**

74. **Assurant and SG Insurance.** As to both Assurant and SG Insurance, Dr. Johnson pleads at
    least three (3) predicate acts of federal mail (wire) fraud under 18 U.S.C. § 1341 (18 U.S.C. §
    1343). Furthermore, Dr. Johnson pleads allegations of federal mail and wire fraud with
    particularity, pursuant to FRCP 9(b). First, in Para. 41 & 43, in two (2) separate instances, in
    furtherance of their scheme to obtain money and control over Lots 16 & 18, by using the U.S.
    wires and mail, Assurant and SG Insurance each defrauded the North Carolina Insurance
    Commission by representing to said Commission that Dr. Johnson was required under the
    Deed of Trust to have hazard insurance on Lots 16 & 18 to insure PennyMac's security
    interest, insurable interest and real property interest in Lots 13, 15 & 17 (vacant land), even
    though they knew that such was not the case. *See* Threshold Issue #2, above. Specifically, in
    the August 30, 2019 Letter to said Commission, Assurant and SG Insurance each state that
    SG Insurance "provide[s] lender place coverage at [PennyMac's] discretion." Furthermore, in
    the September 26, 2019 Letter to said Commission, Assurant and SG Insurance each state
    that "the  insurance will remain in effect," rather than become "invalid, under its terms,"
    because of PennyMac's material misrepresentation. Para. 43. Second, in Para. 46, in

furtherance of their scheme to obtain money and control over Lots 16 & 18, by using the U.S.
wires and mail, Assurant and SG Insurance each defrauded Dr. Johnson by representing to
Dr. Johnson that Dr. Johnson was required under the Deed of Trust to have hazard insurance
on Lots 16 & 18 to insure PennyMac's security interest, insurable interest and real property
interest in Lots 13, 15 & 17 (vacant land). *See* Threshold Issue #2, above. Accordingly, in at
least three (3) instances, SG Insurance, and Assurant each knowingly used the U.S. mails and
wires, in violation of 18 U.S.C. §§ 1341 and 1343, for the purpose of unlawfully obtaining
(or seeking to obtain) money and control over Dr. Johnson's real property (Lots 16 & 18),
thereby depriving Dr. Johnson of said money and other economic property rights, including
exclusivity over his real property (Lots 16 & 18).

75. **PennyMac.** As to PennyMac, Dr. Johnson pleads at least sixteen (16) predicate acts of
federal mail (wire) fraud under 18 U.S.C. § 1341 (18 U.S.C. § 1343). Furthermore, Dr.
Johnson sufficiently pleads allegations of federal mail and wire fraud with particularity,
pursuant to FRCP 9(b). First, in at least one instance, in furtherance of the *Enterprise*'s
scheme to obtain money and control over Lots 16 & 18 by perpetuating the false narrative
(*see* Threshold #1, above) to the Farm Bureau (FB) that Dr. Johnson had to have hazard
insurance with respect to the improvements on Lots 16 & 18 to insure PennyMac's security
(insurable) interest in Lots 13, 15 & 17, over Dr. Johnson's objections, PennyMac used the
U.S wires and mails to take money from Dr. Johnson's escrow account to pay FB for hazard
insurance on Lots 16 & 18. Para. 26-28. Second, in at least two (2) instances, in furtherance
of the *Enterprise*'s scheme to obtain money and control over Lots 16 & 18 by perpetuating
the false narrative (*see* Threshold #1, above) to Johnson that Johnson had to have hazard
insurance with respect to the improvements on Lots 16 & 18 to insure PennyMac's security

(insurable) interest in Lots 13, 15 & 17, PennyMac used the U.S mails. Para. 29-31. Third, in

at least eleven (11) instances, in furtherance of the *Enterprise*'s scheme to obtain money and

control over Lots 16 & 18 by perpetuating the false narrative (*see* Threshold #1, above) to

Dr. Johnson and Clare (an FB agent) that Dr. Johnson had to have hazard insurance with

respect to the improvements on Lots 16 & 18 to insure PennyMac's security (insurable)

interest in Lots 16 & 18, PennyMac used the U.S wires and mails Para. 33-37,49-51. Fourth,

in at least two (2) instances in furtherance of the *Enterprise*'s scheme to obtain money and

control over Lots 16 & 18 by perpetuating the false narrative (*see* Threshold #1, above) to

Dr. Johnson and the N.C. Commission of Banks that Dr. Johnson had to have hazard

insurance with respect to the improvements on Lots 16 & 18 to insure PennyMac's security

(insurable) interest in Lots 16 & 18, PennyMac used the U.S wires and mails Para. 39-40.

Based upon the foregoing, in at least sixteen (16) instances, PennyMac knowingly used the

U.S. mails and wires, in violation of 18 U.S.C. §§ 1341 and 1343, for the purpose of

unlawfully obtaining (or seeking to obtain) money and control over Dr. Johnson's real

property (Lots 16 & 18), thereby depriving Dr. Johnson of said money and other economic

property rights, including exclusivity over his real property (Lots 16 & 18).

### Dr. Johnson Pleads Federal Extortion

76. **Assurant and SG Insurance.** As to Assurant and SG Insurance, Dr. Johnson sufficiently

pleads at least one (1) predicate acts of federal extortion under the Hobbs Act, 18 U.S.C. §

1951. Specifically, in Para. 46, in furtherance of their scheme to obtain control over Lots 16

& 18, Assurant and SG Insurance each used a threatened fear of economic loss, in seeking to

induce Dr. Johnson's consent to buy hazard insurance on Lots 16 & 18, even though

Assurant and SG Insurance each knew that Dr. Johnson was under no legal obligation to do

so. *See* Threshold Issue #2, above. Para. 46. Accordingly, in Para. 46, SG Insurance and Assurant each knowingly engaged in Hobbs Act (18 U.S.C. § 1951) extortion, wherein each obtained (or sought to obtain), from Dr. Johnson, money and control over Dr. Johnson's real property (Lots 16 & 18), each of which is a source or element of wealth, with his consent by extortionate means, induced by a climate of intimidation sourced in the wrongful use of actual or threatened economic injury, or fear, under color of lawful right.

77. **PennyMac**. As to PennyMac, Dr. Johnson pleads at least two (2) predicate acts of federal extortion under the Hobbs Act, 18 U.S.C. § 1951. Specifically, in at least four (4) instances (Para. 33, 36, 48-49), in furtherance of the *Enterprise*'s scheme to obtain money and control over Lots 16 & 18, PennyMac used threatened fear of economic loss, in seeking (or attempting to seek) to induce Dr. Johnson's consent to buy hazard and flood insurance on Lots 16 & 18, even though PennyMac knew that Dr. Johnson was under no legal obligation to do so. *See* Threshold Issue #1, above. Para. 33, 36, 48-49. Here PennyMac's communications did not merely "advise" or "encourage" Dr. Johnson to obtain homeowner's insurance. Accordingly, in Para. 33, 36, 48-49, PennyMac knowingly engaged in Hobbs Act (18 U.S.C. § 1951) extortion, wherein PennyMac obtained (or sought to obtain), from Dr. Johnson, money and control over Dr. Johnson's real property (Lots 16 & 18), each of which is a source or element of wealth, with his consent, by extortionate means, induced by a climate of intimidation sourced in the wrongful use of actual or threatened economic injury, or fear, under color of lawful right.

DR. JOHNSON PLEADS
THE "PATTERN" (OF RACKETEERING ACTIVITY) ELEMENT

### Dr. Johnson Establishes the Requisite "Continuity" Component of A "Pattern" of Racketeering Activity

78. **Assurant and SG Insurance.** With respect to both Assurant and SG Insurance, in Para. 41, 43, 48-51, Dr. Johnson sufficiently establishes the requisite "Continuity" component of a "Pattern" of Racketeering Activity, where the predicates alleged establish on-going schemes, with a **distinct, threat of long-term racketeering activity, either implicit or explicit**. Moreover, Dr. Johnson has shown that such criminal activity will continue, unabated, driven by the possibility of repeated economic gain, until the actions of Assurant and SG Insurance are stopped by this Court. But further, with respect to both Assurant and SG Insurance, **the threat of continuity is also established by showing that the predicate acts proved are part of the *Enterprise's* regular way of doing business**. Here, the predicates, alleged to have been committed by Assurant and SG Insurance, can be attributed to the regular way in which Assurant and SG Insurance participated in the conduct of the affairs of the *Enterprise*. For example, Assurant and SG Insurance each continue to maintain:

> "Apparently, the description of the encumbered property on the Mortgage did not comport with the parties' intention, or the appraisal. . .
>
> **Johnson's Mortgage requires that he maintain adequate insurance coverage on the improvements to the Property.**" Bold added.

demonstrating, once again, a **distinct threat of long-term racketeering activity.**

Finally, based on Dr. Johnson's allegations concerning the participation by both Assurant and SG Insurance in the *Enterprise*'s ongoing, unlawful schemes to obtain money and control over real property, the actions alleged to have been committed by Assurant and SG Insurance clearly pose a special threat to social well-being.

79. **PennyMac.** With respect to PennyMac, in Para. 26-28, 29-31, 33-37, 39-40, 43, 46, 48-51,

Dr. Johnson sufficiently establishes the requisite "Continuity" component of a "Pattern" of

Racketeering Activity, where the predicates alleged, over more than a 2-year period,

establish on-going schemes, with a **distinct, threat of long-term racketeering activity,**

**either implicit or explicit**. Moreover, Dr. Johnson has shown that such criminal activity will

continue, unabated, driven by the possibility of repeated economic gain, until the actions of

PennyMac are stopped by this Court. But further, with respect to PennyMac, **the threat of**

**continuity is also established by showing that the predicate acts proved are part of the**

***Enterprise's* regular way of doing business**. Here, the predicates, alleged to have been

committed by PennyMac, can be attributed to the regular way in which PennyMac

participated in the conduct of the affairs of the *Enterprise*. As stated by PennyMac in its

reformation claim:

> "These acts are PennyMac's core business . . ."

Such statement, by PennyMac, demonstrates, once again, a **distinct threat of long-term**

**racketeering activity.** Furthermore, in its reformation claim, PennyMac continues to maintain

in:

> "**PennyMac's right to purchase lender-placed insurance and charge Johnson's**
> **escrow account with the costs arises from the Deed of Trust** . . ."

Here, it is important to observe that on September 16, 2020, PennyMac unlawfully withdrew

$2,138.56 from Dr. Johnson's bank account, in part, to pay for a forced, lender-placed insurance

policy issued by SG Insurance on Lots 16 & 18. Finally, based on Dr. Johnson's allegations

concerning the participation by PennyMac in the *Enterprise*'s ongoing, unlawful schemes to

obtain money and control over real property, the actions alleged to have been committed by

PennyMac clearly pose a special threat to social well-being.

### Dr. Johnson Establishes the Requisite
### "Relatedness" Component of a "Pattern" of Racketeering Activity

80. **Assurant and SG Insurance.** With respect to both Assurant and SG Insurance, Dr. Johnson

establishes the requisite "Relatedness" Component of a "Pattern" of Racketeering Activity.

Specifically, in Para. 41, 43, 46 & 48 Dr. Johnson alleges that Assurant and SG Insurance

each committed numerous predicate acts related to the *Enterprise*'s common purpose of

obtaining money and control over Lots 16 & 18. Furthermore, in Para. 41, 43, 46 & 48, Dr.

Johnson alleges that Assurant and SG Insurance each committed numerous acts of federal

mail and wire fraud with the same participants, victim, and methods of commission.

81. **PennyMac.** With respect to PennyMac, Dr. Johnson establishes the requisite "Relatedness"

Component of a "Pattern" of Racketeering Activity. Specifically, in Para. 26-28, 29-31, 33-

37, 39-40, 43, 46, 48-51, Dr. Johnson alleges that PennyMac committed numerous predicate

acts related to the *Enterprise*'s common purpose of obtaining money and control over Lots

16 & 18. Furthermore, in Para. 26-28, 29-31, 33-37, 43, 46, 49-51, Dr. Johnson alleges that

PennyMac committed numerous acts of federal mail and wire fraud with the same

participants, victim, and methods of commission. Similarly, in Para. 33 & 36, Dr. Johnson

alleges that PennyMac committed numerous acts of Federal Hobbs Act extortion with the

same participants, victim, and methods of commission.

### Dr. Johnson Establishes the Requisite Distinction between
### The "*Enterprise*" and the "Pattern of Racketeering Activity."

82. **Assurant and SG Insurance.** With respect to both Assurant and SG Insurance, because Dr. Johnson sufficiently pleads (1) the Enterprise Element [*see* Para. 58] and (2) the "Pattern of Racketeering Activity" Element [*see* Para. 74, 76, 78, 80] of a Section 1962(c) violation, Dr. Johnson establishes the requisite distinction between the "*Enterprise*" and the "Pattern of Racketeering Activity."

83. **PennyMac.** With respect to PennyMac, because Dr. Johnson sufficiently pleads (1) the Enterprise Element [*see* Para. 58] and (2) the "Pattern of Racketeering Activity" Element [*see* Para. 75, 77, 79, 81] of a Section 1962(c) violation, Dr. Johnson establishes the requisite distinction between the "*Enterprise*" and the "Pattern of Racketeering Activity."

### DR. JOHNSON PLEADS THE "CONDUCT OR PARTICIPATE" IN THE "CONDUCT OF THE AFFAIRS OF AN ENTERPRISE" ELEMENT

84. **Assurant and SG Insurance.** With respect to both Assurant and SG Insurance**,** Dr. Johnson's verified factual allegations, contained in Para. 2-51, plead the "Participate" in the "Conduct of the Affairs of an Enterprise" Element with respect to both Assurant and SG Insurance. Specifically, Dr. Johnson pleads the Enterprise Element in Para. 58 with its formation ["through their relationships within the forced, lender- placed insurance system, PennyMac, Assurant and SG Insurance formed an association-in-fact RICO enterprise"], purpose [the *Enterprise* "used the forced, lender- placed insurance system as a vehicle for the shared purpose of (1) making money (obtaining Dr. Johnson's money) and (2) controlling Dr. Johnson's real property (Lots 16 & 18)"], and modus operandi [the *Enterprise* conducted/established "schemes and artifices to accomplish the *Enterprise*'s common purpose"]. Within this *Enterprise*, the role of Assurant and SG Insurance, as persons, is to

carry out the **schemes and artifices** described in Para. 58 to deprive Dr. Johnson of his

interest in property. Accordingly, Assurant and SG Insurance, as persons, each

"participat[ed] in the conduct of the affairs of The PennyMac Association-in-Fact RICO

Enterprise" by "carrying out the **fraudulent schemes and artifices** described in Para. 58 to

deprive Dr. Johnson of his interest in property for the *Enterprise*'s benefit. *See* Para. 43, 46 &

48.

85. **PennyMac.** With respect to PennyMac, Dr. Johnson's verified factual allegations, contained

in Para. 2-51, plead the "Participate" in the "Conduct of the Affairs of an Enterprise"

Element with respect to PennyMac. Specifically, Dr. Johnson sufficiently pleads the

Enterprise Element in Para. 58 with its formation ["through their relationships within the

forced, lender- placed insurance system, PennyMac, Assurant and SG Insurance formed an

association-in-fact RICO enterprise"], purpose [the *Enterprise* "used the forced, lender-

placed insurance system as a vehicle for the shared purpose of (1) making money (obtaining

Dr. Johnson's money) and (2) controlling Dr. Johnson's real property (Lots 16 & 18)"], and

modus operandi [the *Enterprise* conducted/established "schemes and artifices to accomplish

the *Enterprise*'s common purpose"]. Within this *Enterprise*, the role of PennyMac, as a

person, is to carry out the **schemes and artifices** described in Para. 58 to deprive Dr. Johnson

of his interest in property. Accordingly, PennyMac, as a person, "participat[ed] in the

conduct of the affairs of The PennyMac Association-in-Fact RICO Enterprise" by "carrying

out the **fraudulent schemes and artifices** described in Para. 58 to deprive Dr. Johnson of his

interest in property for the *Enterprise*'s benefit. *See* Para. 26-28, 29-31, 33-37, 43, 46, 49-51.

**Dr. Johnson Establishes the Requisite Nexus between "Conduct or Participate"
and "Pattern of Racketeering Activity"**

86. **Assurant and SG Insurance.** With respect to both Assurant and SG Insurance**,** Dr. Johnson

establishes the requisite nexus between "Conduct or Participate" and "Pattern of

Racketeering Activity." As stated above in Para. 84, Assurant and SG Insurance, as persons,

each "participat[ed] in the conduct of the affairs of The PennyMac Association-in-Fact RICO

Enterprise" by "carrying out the **fraudulent schemes and artifices** described in Para. 58 to

deprive Dr. Johnson of his interest in property for the *Enterprise*'s benefit. *See*, in particular,

Para. 41, 43 & 48. Based upon Para. 41, 43 & 48, Assurant and SG Insurance were each

engaged in three (3) predicate acts of federal mail fraud and one (1) predicate act of Hobbs

Act extortion, constituting a "Pattern of Racketeering Activity." *See* Para. 74, 76, 78, 80.

Here, Dr. Johnson has pled that Assurant and SG Insurance have each "participat[ed] in the

conduct of the affairs of The PennyMac Association-in-Fact RICO Enterprise" by means of

(through) a "Pattern of Racketeering Activity." When Assurant and SG Insurance each uses

its position (role) in the *Enterprise* to commit the racketeering acts, the "through"

requirement is satisfied.

87. **PennyMac** With respect to PennyMac**,** Dr. Johnson establishes the requisite nexus between

"Conduct or Participate" and "Pattern of Racketeering Activity." As stated above in Para. 85,

PennyMac, as a person, "participat[ed] in the conduct of the affairs of The PennyMac

Association-in-Fact RICO Enterprise" by "carrying out the **fraudulent schemes and**

**artifices** described in Para. 58 to deprive Dr. Johnson of his interest in property for the

*Enterprise*'s benefit. *See*, in particular, Para. 26-28, 29-31, 33-37, 43, 46, 49-51. Based upon

Para. 26-28, 29-31, 33-37, 43, 46, 49-51, PennyMac was engaged in sixteen (16) predicate

acts of federal mail fraud and four (4) predicate acts of Hobbs Act extortion, constituting a

"Pattern of Racketeering Activity." *See* Para. 75, 77, 79, 81. Here, Dr. Johnson has pled that

PennyMac has "participat[ed] in the conduct of the affairs of The PennyMac Association-in-

Fact RICO Enterprise" by means of (through) a "Pattern of Racketeering Activity." When

PennyMac uses its position (role) in the *Enterprise* to commit the racketeering acts, the

"through" requirement is satisfied.

DR. JOHNSON PLEADS
THAT HE WAS INJURED IN HIS PROPERTY
BY REASON OF A VIOLATION OF SECTION 1962(c)

88. **Damages.** The facts, as alleged, show that, as a direct and proximate cause of the violation

by Defendants, PennyMac, SG Insurance, and Assurant**,** of 18 U.S.C. § 1962(c), Dr. Johnson

has suffered injury to his property due to the **schemes and artifices** executed by each of said

Defendants through predicate acts of mail and wire fraud (pursuant to 18 U.S.C. §§ 1341 and

1343) and Hobbs Act (18 U.S.C. § 1951) extortion, within an *organizational nexus*, to

unlawfully deprive Dr. Johnson of his interest in property. Specifically, Dr. Johnson was

unlawfully deprived of (1) control (exclusivity) of Lots 16 & 18 [Para. 26-28, 29-31, 33-37,

43, 39-41, 43, 46, 48-51], (2) money in the form of escrow funds [Para. 26-28], (3) money in

the form of an increase in debt (or decrease in escrow account) for the cost of 2019 and 2020

hazard insurance on Lots 16 & 18 [Para. 29-31, 33-37, 39-41, 43, 46, 48-51], (4) money in

the form of the cost of 2019 PIP and flood insurance [Para. 35] and (5) money in the form of

the cost of the annual Sewer District Fee on Lots 13, 15 & 17 [Para. 9, 32]. As to the cost of

the 2019 and 2020 hazard insurance, PennyMac may claim that Johnson "has suffered no

damages because . . . [PennyMac] "refund[ed] Johnson's escrow payments." However, with

respect to the 2019 hazard insurance, in its September 17, 2019 Letter, PennyMac states that

it "may (1) add the amounts to [Dr. Johnson's] loan balance, (2) add an escrow account to

[Dr. Johnson's] loan . . ." Para. 29, Exhibit XI. Here, it is clear that PennyMac simply added such cost to Dr. Johnson's loan balance, instead of adding an escrow account. In contrast, with respect to the 2020 hazard insurance, PennyMac unlawfully added such cost to Dr. Johnson's escrow account and electronically withdrew an increased amount from Dr. Johnson's bank account without authority or permission. Para. 49-50.

### Dr. Johnson Pleads a Direct Nexus between
### The RICO Predicate Acts and Dr. Johnson's Alleged Injury

89. As shown above in Para. 88, Dr. Johnson sufficiently pleads a direct nexus between the RICO predicate acts and Johnson's alleged injury. The compensable injury necessarily is the direct harm caused by predicate acts. Specifically, the direct harm caused by the defendants' predicate acts is (1) the loss of control of Dr. Johnson's real property (Lots 16 & 18) [Para. 29-31; 33-37; 39-41; 43; 46; 48-51] and (2) the loss of money [Para. 26-28; 33-37; 48-51]. Also, *see* Para. 74-81. Here, Dr. Johnson suffered a real injury when he was deprived of money and control of Lots 16 & 18. Furthermore, Johnson has alleged proximate cause, since Dr. Johnson shows that he was immediately injured by Defendants' multiple schemes.

90. **Joint and severally liability.** As a result of the misconduct noted above, Defendants, PennyMac, SG Insurance and Assurant**,** are each joint and severally liable to Dr. Johnson for his losses in an amount to be determined at trial.

91. **Treble Damages.** Pursuant to RICO, 18 U.S.C. § 1964(c), Dr. Johnson is entitled to recover threefold his damages plus costs and attorneys' fees, joint and severally, from Defendants, PennyMac, SG Insurance and Assurant.

**Count I(b)**

DR. JOHNSON SUFFICIENTLY PLEADS
A VIOLATION OF SECTION 1962(d)

92. Each of the Defendants, PennyMac, SG Insurance and Assurant, violated 18 U.S.C. §§

1962(d) by agreeing to and conspiring with others to conduct or participate in conduct of the

affairs of an enterprise through a pattern of racketeering activity, where at least two acts of

racketeering activity per Defendant are specifically alleged. Specifically, each of the

Defendants, PennyMac, SG Insurance and Assurant, agreed to and conspired with others to

participate in the conduct of the affairs of The PennyMac Association-in-Fact RICO

Enterprise by engaging in the RICO predicate acts of mail and wire fraud (pursuant to 18

U.S.C. §§ 1341 and 1343) and Hobbs Act (18 U.S.C. § 1951) extortion, constituting a pattern

of racketeering activity to defraud and threaten Dr. Johnson for the purpose of obtaining (or

seeking to obtain) money and control over Dr. Johnson's real property (Lots 16 & 18),

thereby depriving Dr. Johnson of said money and other economic property rights, including

exclusivity over his real property (Lots 16 & 18). The alleged facts (Para. 2-51) specified, in

detail, the modus operandi of the various racketeering activities that were the objectives of

the agreed to conspiracy, including the principal actors, the time period of significant events

and evidentiary details as to how the racketeering activity was carried out. Specifically, as to

Assurant and SG Insurance, Dr. Johnson's allegations in Para. 41, 43, 46 & 48 support the

conclusion that Assurant and SG Insurance each "agreed that another coconspirator would

commit two or more acts of racketeering." Furthermore, as to PennyMac, Dr. Johnson's

allegations in Para. 26-28, 29-31, 33-37, 39-41, 43, 46, 48-51, support the conclusion that

PennyMac "agreed that it or another coconspirator would commit two or more acts of

racketeering."

93. **Damages.** As a direct and proximate cause of the agreed to conspiracy, the overt acts in furtherance of that conspiracy, and the violation by each of Defendants, PennyMac, SG Insurance and Assurant, of 18 U.S.C. § 1962(d), Dr. Johnson has suffered injury to his property due to the **schemes and artifices** executed by said Defendants through predicate acts of mail and wire fraud (pursuant to 18 U.S.C. §§ 1341 and 1343) and Hobbs Act (18 U.S.C. § 1951) extortion, within an *organizational nexus*, to unlawfully deprive Dr. Johnson of his interest in property. Dr. Johnson pleads a direct nexus between the RICO predicate acts and Johnson's alleged injury. The compensable injury necessarily is the direct harm caused by such predicate acts. Specifically, the direct harm caused by the defendants' predicate acts is (1) the loss of control of Dr. Johnson's real property (Lots 16 & 18) [Para. 29-31; 33-37; 39-41; 43; 46; 48-51] and (2) the loss of money [Para. 26-28; 33-37; 48-51]. Also, *see* Para. 74-81. Here, Dr. Johnson suffered a real injury when he was deprived of money and control of Lots 16 & 18. Furthermore, Johnson has alleged proximate cause, since Dr. Johnson shows that he was immediately injured by Defendants' multiple schemes.

94. **Joint and severally liability.** As a result of the misconduct noted above, Defendants, PennyMac, SG Insurance and Assurant, are each joint and severally liable to Dr. Johnson for his losses in an amount to be determined at trial.

95. **Treble Damages.** Pursuant to RICO, 18 U.S.C. § 1964(c), Dr. Johnson is entitled to recover threefold his damages plus costs and attorneys' fees, joint and severally, from each of the Defendants, PennyMac, SG Insurance and Assurant.

## COUNT II
## THE FAIR DEBT COLLECTION PRACTICES ACT OF 1978
## (15 U.S.C. 1692-1692o)

96. Count II of this Complaint is a claim against PennyMac, arising under the provisions of The Fair Debt Collection Practices Act of 1978, Pub. L. No. 95-109, 803(6)(F), 91 Stat. 874, 875 (1977) (codified as amended at 15 U.S.C. §§ 1692-1692o (1994 & Supp. III 1998)), hereinafter referred to as the FDCPA, where in bringing this claim, Dr. Johnson seeks to recover statutory damages for himself (and other persons similarly situated), not to exceed $1,000.00 per violation, plus reasonable attorney fees (if attorneys' fees are incurred by Dr. Johnson) under 15 U.S.C. § 1692(k)(a) for PennyMac's violations of the provisions of the FDCPA.

97. **Jurisdiction and Venue.** Federal Question Jurisdiction of this Court is proper under 28 U.S.C. § 1331. In addition, Diversity Jurisdiction of this Court is proper under 28 U.S.C. Section 1332, where this action is of a civil nature involving exclusive of interest and costs, an amount in controversy in excess of $75,000. Venue is proper in this Court, since the facts (including of damages), as alleged have occurred within the boundaries of the State of South Carolina.

98. **Standing.** Dr. Johnson has standing to bring this claim because PennyMac is a debt collector, Dr. Johnson is a debtor, according to PennyMac, and Dr. Johnson has been injured in his property by reason of a violation of 15 U.S.C. §§ 1692-1692o, as provided below.

99. Dr. Johnson repeats and re-alleges each of the allegations contained in paragraphs 2 through 51 as if fully set forth herein.

100. **Respondeat Superior – Defendant PennyMac**. Since:

    **a.** Defendant PennyMac only acts through its agents;

    b. Each act of an Agent/Employee of Defendant PennyMac, herein described was:

        (1) Related to and committed within the course and scope of employment,

        (2) Committed in furtherance of the interests and economic benefits of Defendant PennyMac, and

        (3) Authorized or subsequently acquiesced by Defendant PennyMac;

    c. Defendant PennyMac derived some benefit from each act committed by an Agent/Employee of Defendant PennyMac, herein described; and

    d. under the doctrines of respondeat superior and vicarious liability, the acts of Agent/Employees of Defendant PennyMac, herein described:

        (1) are deemed to be the acts of Defendant PennyMac,

        (2) are chargeable to Defendant PennyMac, and

        (3) are binding upon Defendant PennyMac,

where Defendant PennyMac, is vicariously responsible for the wrongful acts of its agent/employees and imposing vicarious liability upon Defendant PennyMac is not inconsistent with the intent of Congress.

101. PennyMac admits to being a debt collector and that it is attempting to collect a debt that is purported owed to PennyMac because it purchased a hazard insurance policy on Lots 16 & 18 from SG Insurance. *See* Exhibits XI&XII. Thus, PennyMac did not purchase this debt. However, PennyMac's purchase of said insurance was unlawful because PennyMac lacked any capacity to purchase said policy (because PennyMac lacked any insurable or security

interest in Lots 16 & 18). Any claim that PennyMac is debt service provider within this context is false. *See* Threshold Issue #1, above.

102.    As shown herein, as a debt collector, PennyMac's actions were unfair practices in repeated violation of 15 U.S.C. § 1692f.

103.    As shown herein, PennyMac's conduct repeatedly used harassing and abusive tactics in repeated violation of 15 U.S.C. § 1692d.

104.    As shown herein, PennyMac repeatedly made false and misleading representations in repeated violation of 15 U.S.C. § 1692e.

105.    **Damages.** As a direct and proximate cause of the repeated violation of the FDCPA by employee/agents of Defendant, PennyMac, Dr. Johnson has economically suffered due to the **schemes and artifices** executed by the Defendant PennyMac, to unlawfully deprive Dr. Johnson of his interest in property. As a result, Dr. Johnson seeks to recover statutory damages not to exceed $1,000.00 per violation, plus reasonable attorney fees (if attorneys' fees are incurred by Dr. Johnson) under 15 U.S.C. 1692(k)(a) for PennyMac's violations of the provisions of the FDCPA.

## COUNT III
## PENNYMAC'S BREACH OF THE DEED OF TRUST AND
## BREACH OF CONTRACT ACCOMPANIED BY FRAUDULENT ACTS
## OR, IN THE ALTERNATIVE, QUASI-CONTRACT (UNJUST ENRICHMENT)

106.    Count III of this Complaint is a claim against PennyMac under the laws of the states of

North Carolina and South Carolina for *Breach of Contract (Deed of Trust)* and *Breach of*

*Contract Accompanied by Fraudulent Acts*, respectively, or, in the alternative, quasi-contract

(unjust enrichment).

107.    **Jurisdiction and Venue.** Diversity Jurisdiction of this Court is proper under 28 U.S.C.

Section 1332, where this action is of a civil nature involving exclusive of interest and costs,

an amount in controversy in excess of $75,000. Venue is proper in this Court, since the facts

(including of damages), as alleged have occurred within the boundaries of the State of South

Carolina.

108.    **Standing.** Dr. Johnson has standing to bring this claim because PennyMac is an assignee

of the beneficial interests of a Deed of Trust, where PennyMac acted in contravention of the

terms and conditions of said Deed of Trust, and where, as a result, Dr. Johnson was injured in

his property by reason of such conduct. Also, Dr. Johnson has standing to bring this claim

because PennyMac formed a unilateral contract with Dr. Johnson in South Carolina, where

PennyMac breached said contract in a fraudulent manner.

109.    Dr. Johnson repeats and re-alleges each of the allegations contained in paragraphs 2

through 51 as if fully set forth herein.

### PennyMac's Breach of Deed of Trust

110.    As shown herein, PennyMac is an assignee of the beneficial interests of property in a

Deed of Trust, where Dr. Johnson is the assignor.

111.    As shown herein, PennyMac, as an assignee, has breached the Deed of Trust, by failing

to carry out the terms, promises, and conditions of said Deed of Trust. Specifically, Dr.

Johnson sufficiently pleads the existence of the Deed of Trust, from which PennyMac has the

beneficial interest. Para. 16, 17, 23. Furthermore, Dr. Johnson sufficiently pleads

PennyMac's multiple breaches of said Deed of Trust by showing that PennyMac imposed

charges related to forced lender-placed hazard insurance that were not bona fide and

reasonable. Para. 33, 36, 37, 40, 43, 46, 49-51.

112.    As shown herein, as a direct and proximate cause of the breach of said Deed of Trust, Dr.

Johnson has suffered injury to his property.

**PennyMac's Breach of Unilateral Contract Accompanied by Fraudulent Acts**

113.    Dr. Johnson has stated a claim for breach of contract accompanied by a fraudulent act

under South Carolina common law. Here, Dr. Johnson has pled facts establishing three

elements: (1) a breach of contract; (2) fraudulent intent relating to the breaching of the

contract and not merely to its making; and (3) a fraudulent act accompanying the breach.

114.    As shown herein, a unilateral contract was formed between PennyMac and Dr. Johnson.

Specifically, Dr. Johnson pleads the offer and acceptance of a unilateral contract between

Johnson, a South Carolina resident, and PennyMac. Para. 3, 31, 32, 87.

115.    As shown herein, PennyMac breached said unilateral contract in a fraudulent manner and

intended to so. Specifically, Dr. Johnson sufficiently pleads multiple fraudulent acts by

PennyMac, breaching said contract with fraudulent intent. Para. 33, 36, 37, 40, 43,46, 49-51.

116.    As shown herein, as a direct and proximate cause of the breach of said Unilateral

Contract, Dr. Johnson has suffered injury to his property.

117.  **Punitive Damages.** The actions of PennyMac, as herein described, were committed with either (a) an actual and deliberate intention to cause harm to Dr. Johnson's property or (b) an utter indifference or conscious disregard for Dr. Johnson's property, thereby constituting willful or wanton conduct and accordingly justify the awarding of exemplary and punitive damages in the amount of $100,000 to deter similar or repetitious conduct by PennyMac in the future.

**Quasi-Contract (Unjust Enrichment)**

118.  In the alternative, given that Dr. Johnson separated Lots 16 & 18 from Lots 13, 15 & 17, as instructed to do so by PennyMac, thereby accruing an additional Sewer District Fee of over $600 per year, on a recurring basis, PennyMac would be unjustly enriched if Dr. Johnson were no able to receive the benefits of his "bargain."

## COUNT IV
## PENNYMAC'S VIOLATION OF
## THE REAL ESTATE SETTLEMENT PROCEDURES ACT (RESPA)

119.   Count IV of this Complaint is a claim against PennyMac, arising under the provisions of

The Real Estate Settlement Procedures Act (hereinafter referred to as RESPA), where in

bringing this claim, Dr. Johnson seeks to recover damages plus reasonable attorney fees (if

attorneys' fees are incurred by Dr. Johnson).

120.   **Jurisdiction and Venue.** Federal Question Jurisdiction of this Court is proper under 28

U.S.C. § 1331. In addition, Diversity Jurisdiction of this Court is proper under 28 U.S.C.

Section 1332, where this action is of a civil nature involving exclusive of interest and costs,

an amount in controversy in excess of $75,000. Venue is proper in this Court, since the facts

(including of damages), as alleged have occurred within the boundaries of the State of South

Carolina.

121.   **Standing.** Dr. Johnson has standing to bring this claim because PennyMac imposed

charges related to forced, lender-placed hazard insurance that were not bona fide and

reasonable [Para. 33, 36, 37, 40, 43, 46, 49-51], in violation of RESPA [12 U.S.C. §

2605(m)].

122.   Dr. Johnson repeats and re-alleges each of the allegations contained in paragraphs 2

through 51 as if fully set forth herein.

123.   **Respondeat Superior – Defendant PennyMac.** Since:

  **a.** Defendant PennyMac only acts through its agents**;**

  b. Each act of an Agent/Employee of Defendant PennyMac, herein described was:

      (1) Related to and committed within the course and scope of employment,

      (2) Committed in furtherance of the interests and economic benefits of Defendant

         PennyMac, and

(3) Authorized or subsequently acquiesced by Defendant PennyMac;

c. Defendant PennyMac derived some benefit from each act committed by an Agent/Employee of Defendant PennyMac, herein described; and

d. under the doctrines of respondeat superior and vicarious liability, the acts of Agent/Employees of Defendant PennyMac, herein described:

(1) are deemed to be the acts of Defendant PennyMac,

(2) are chargeable to Defendant PennyMac, and

(3) are binding upon Defendant PennyMac,

where Defendant PennyMac, is vicariously responsible for the wrongful acts of its agent/employees and imposing vicarious liability upon Defendant PennyMac is not inconsistent with the intent of Congress.

124. As shown herein, PennyMac imposed charges related to forced, lender-placed hazard insurance that were not bona fide and reasonable [Para. 33, 36, 37, 43, 46, 49-51], in violation of RESPA [12 U.S.C. § 2605(m)].

125. As shown herein, as a direct and proximate cause of PennyMac's violation of RESPA [12 U.S.C. § 2605(m)], Dr. Johnson has suffered injury to his property.

126. **Punitive Damages.** The actions of PennyMac, as herein described, were committed with either (a) an actual and deliberate intention to cause harm to Dr. Johnson's property or (b) an utter indifference or conscious disregard for Dr. Johnson's property, thereby constituting willful or wanton conduct and accordingly justify the awarding of exemplary and punitive damages in the amount of $100,000 to deter similar or repetitious conduct by PennyMac in the future.

**WHEREFORE**, Dr. Johnson prays for MONEY DAMAGES as follows:

## COUNT I - MONEY DAMAGES

Judgment, jointly and severally, against each of the Defendants, PennyMac, SG Insurance and

Assurant, as follows:

--   for statutory general and special damages.

--   for reasonable attorney's fees,

--   for costs of suit herein incurred,

--   for pre- and post-judgment interest, and

--   for such other and further relief as the Court deems equitable in the circumstances.

## COUNT II - MONEY DAMAGES

Judgment against Defendant PennyMac, as follows:

   --   for statutory general and special damages.

   --   for reasonable attorney's fees,

   --   for costs of suit herein incurred,

   --   for pre- and post-judgment interest, and

   --   for such other and further relief as the Court deems equitable in the circumstances.

**COUNT III - MONEY DAMAGES**

Judgment against Defendant PennyMac, as follows:

--     for general and special damages.

--     for exemplary or punitive damages of $100,000 to deter similar or repetitious actions

by Defendant PennyMac.

-- for reasonable attorney's fees,

-- for costs of suit herein incurred,

-- for pre- and post-judgment interest, and

--     for such other and further relief as the Court deems equitable in the circumstances

**COUNT IV - MONEY DAMAGES**

Judgment against Defendant PennyMac, as follows:

-- for statutory general, special and punitive damages.

-- for reasonable attorney's fees,

-- for costs of suit herein incurred,

-- for pre- and post-judgment interest, and

-- for such other and further relief as the Court deems equitable in the circumstances.

Dated: March 19, 2021

*Brad R. Johnson*

**BRAD R. JOHNSON,**
**Plaintiff, Pro Se**

Brad R. Johnson, Ph.D., J.D., C.P.A. (Inactive, OR, #4278)
8669 Laurel Woods Drive
Myrtle Beach, SC 29588
(843) 661-1427
bjohnson@fmarion.edu

## VERIFICATION

Under penalties of perjury, the undersigned certifies that the statements set forth in this

instrument are true and correct, except as to matters stated to be on information and belief and as

to such matters the undersigned certifies that he believes the same to be true.

Dated: March 19, 2021

**BRAD R. JOHNSON,**
**Plaintiff, Pro Se**

Brad R. Johnson, Ph.D., J.D., C.P.A. (Inactive, OR, #4278)
8669 Laurel Woods Drive
Myrtle Beach, SC  29588
(843) 661-1427
bjohnson@fmarion.edu

## DEMAND FOR JURY TRIAL

Plaintiff, Brad R. Johnson, demands a jury trial on all Counts of this Complaint.

Dated: March 19, 2021

**BRAD R. JOHNSON,**
**Plaintiff, Pro Se**

Brad R. Johnson, Ph.D., J.D., C.P.A. (Inactive, OR, #4278)
8669 Laurel Woods Drive
Myrtle Beach, SC  29588
(843) 661-1427
bjohnson@fmarion.edu